# NARRATIVE SUMMARY AND MEDICAL OPINION IN THE MATTER OF
# ESTATE OF ANTONIO MAY v. FULTON COUNTY, GA, et al
## CASE # 1:19-CV-2440-TWT
## U.S. DISTRICT COURT, NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

The Summary and Medical Opinions contained herein are authored by Timothy E. Hughes, MD, FACS. I have been requested to opine on the healthcare provided to Antonio May while incarcerated and in the custody of Fulton County Jail in Atlanta, GA. The fee schedule used for my services is attached, pursuant to federal rules. My Curriculum Vitae has been supplied to the plaintiff's counsel and is attached, but to briefly summarize, I have a Bachelor's of Science (BS) degree in Chemistry and Biology from the University of Alabama and a Doctor of Medicine (MD) degree from the University of South Alabama College of Medicine. I completed my Residency training at the Medical College of Wisconsin and am Board Certified. I have practiced medicine full time since completing my Residency in 1998. I have worked in the private, military and corrections/law enforcement sectors. I have served as a Senior Flight Surgeon in the U.S. Air Force and was Honorably Discharged in 2014. Relative to this case, I have 6 years' experience in Correctional Medicine-both at the site level and in Administration and am a member of the American College of Correctional Physicians and a Fellow of the American College of Surgeons. I have been involved with the direct treatment of inmates at the site level, as well as in a management capacity as Chief Medical Officer for one of the larger national correctional medicine corporations. I hold Instructor credentials with the American Heart Association for Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS), and have been trained as a Provider in Advanced Trauma Life Support (ATLS) by the American College of Surgeons. Lastly, I have served as Sheriff's Surgeon for the Mobile County (AL) Sheriff's Office since 2011 and am assigned to Special Operations/SWAT. I am not involved in any capacity with care of inmates in the custody of Mobile County. I am a member of the National Tactical Officer's Association (NTOA) and the National Sheriff's Association (NSA). I have served previously as an expert witness in both civil and criminal litigation, but I do not consider these activities as a significant or primary aspect of my professional work as it relates to time or revenue.

In formulating my opinions herein, I have utilized my own professional training, education and experience. In addition, thus far I have referenced the following materials: Discharge documents from Grady Hospital, Security Records from the Fulton County Jail, Medical Records from NaphCare (Medical contractor to the Fulton County Jail), Investigation and Autopsy Reports from the Fulton County Medical Examiner's Office, Affidavit of Joseph Wright, MD, video footage from the jail Property/Inmate Dress Out Area, the Georgia Death Certificate for Antonio May and *Standards for Health Services in Jails* published by the National Commission on Correctional Healthcare (NCCHC), 2018 Edition.

**BACKGROUND:**

Antonio May was arrested by Officer B. Jolly of the Atlanta Police Department on 11 SEP 2018 at 0444 hours. Having suspicion of acute intoxication and/or psychiatric issues based on his behavior, he was taken by police to Grady Hospital for medical clearance prior to booking into the Fulton County Jail. Discharge documents from Grady Hospital on the same date at 0649 hours indicate diagnoses of Severe

Page 2

methadone use disorder and Substance-induced psychotic disorder. He was not discharged with any prescriptions.

Mr. May's Jail Intake Health Screening document was completed on 11 SEP 2018 at 0901 hours by T. Williams. This screening form documents Mr. May as an "Actively or suspected detoxing patient" and as an individual with "current suicidal thoughts or self-harm intentions". The words "no plan" are written beneath this screening item. Vital signs were recorded as within normal parameters and he was deemed "fit for confinement". There is no record provided that indicate this data was communicated to medical, mental health or security staff for medical/psychological management and classification purposes. A urine drug screen is documented by NaphCare at 1154 hours as positive for Amphetamine, MDMA (Ecstasy) and methamphetamine. There is no sign off or record of this data being reviewed or communicated to either jail security staff nor a medical provider (Physician or Advanced Practitioner) for medical orders, further evaluation or custody classification purposes. The National Commission on Correctional Healthcare *Standards for Healthcare in Jails, 2018* clearly delineate that detainees with known or suspected substance abuse symptoms or withdrawal, as well as suicidal ideation, be immediately confined to medically controlled observation with direct visual or CCTV monitoring for further care and treatment. Instead, Mr. May was confined in an observation cell in the booking area (Holding Cell 172).

Later in the afternoon of 11 SEP 2018, a cell check was done by a deputy and Mr. May was found to be in his cell nude and masturbating. He was reportedly ordered by deputies several times to cease his behavior and put on his jail uniform. Despite numerous verbal commands, he refused to comply. A cell entry team of 6 deputies (DART) were summoned and the cell opened. Mr. May refused verbal commands on entry to place his hands behind his back for restraint. A deputy deployed his conducted energy weapon (CEW), or "Taser", and fired at Mr. May, bringing him to a partially seated position. As deputies attempted to bring Mr. May to the floor, a struggle ensued. At least two "drive stuns" were attempted with the Taser, as well as deployment of pepper spray (oleoresin capsicum) to Mr. May's face. Following this, Mr. May maneuvered and tried to escape the cell, but was subsequently pushed to the floor by deputies and ultimately restrained with handcuffs and leg irons. Mr. May continued to thrash and kick in a violent manner and a belly chain was applied. He was moved to a transport chair and secured, then taken to the shower area for decontamination. Following decontamination with water, he was moved back to the chair and restrained, as jail pants were placed on his lower body. Mr. May was then moved to the Property Area in the restraint chair. The Physician Assistant (David Didier) was requested to do a post-use of force examination as required by policy.

Video footage (without audio) was reviewed from the Property/Inmate Dress Out Area. The video is date stamped 11 SEP 2018 as well as time stamped. Review of the video demonstrates the following events: Entry to the camera's view can be seen of Mr. May in a restraint chair accompanied by deputies at 1608. Mr. May was noted to exhibit movement in his legs and sitting upright upon entry. He is held in this area until Mr. Didier's arrival at 1609. Mr. Didier arrived without any visible equipment or instruments to complete a proper post-use of force examination. He is seen walking about Mr. May in the chair. The only contact by Mr. Didier appears to be lifting of the spit shield and otherwise visualization of him restrained in the chair. There was no assessment of pulse or other vital signs seen in the video. After this brief interaction, Mr. Didier left the area at 1610.

At timestamp 1612, Mr. May appears to be motionless and head slightly drooping. He remains accompanied by six deputies in the area. At 1611, a deputy appears to try and elicit a response to a gentle shake; none is seen. The spit shield is lifted and a deputy is seen looking at Mr. May's face; another deputy shines a flashlight in his eyes. It then appears deputies call out for assistance. At timestamp 1614, the first medical personnel appear from the doorway in the left field of camera view. At this point, it is clear that the critical nature of Mr. May's condition is recognized, and he is released from restraints and moved to the floor. He is assessed and CPR was initiated by deputies at 1614. Further medical and security personnel arrive and resuscitative attempts continued with an automatic external defibrillator (AED) applied. An intravenous access is placed by medical staff. The CPR continues until arrival of Atlanta Fire/EMS personnel at 1629. The EMS personnel then assume management. Resuscitative efforts are continued until 1641, at which time the medical personnel discontinue their care.

Following the Intake Medical Screening and urine drug testing as described previously, the next chronological medical document is a NaphCare "Emergency Code Report", dated 11 SEP 2018 with a call time of 1610 and arrival time of 1615. Interestingly, this report documents Mr. May's vital signs as: O2 Saturation=99%, Blood Pressure=128/80, Heart Rate=70, Temperature=98.0 and Respirations=18. On the same page, Mr. May is described as "no breathing" and "no pulse". A notation is made on medical history as "drug abuse". No mention of the positive drug screen on intake noted. The remainder of the form describes the resuscitative efforts. He is described on this document as "Pronounced Dead" at 1640 hours.

It is noted that the Atlanta Police Department Homicide Unit, Georgia Bureau of Investigation (GBI), and Fulton County Medical Examiner's Office were notified to respond. Of these three agencies, only the Medical Examiner's records were available for review.

Mr. May's remains were transferred from the jail to the Fulton County Medical Examiner's Office. The Medical Examiner's case number is 18-1800. An autopsy was completed by Ryan McCormick, MD on 13 SEP 2018. Pathological findings include:

- Sudden cardiovascular collapse
- Probable excited delirium with physical restraint use
- Substance induced psychotic disorder
- Interaction with correctional officers
    - Use of CED
    - Exposure to oleoresin capsicum
    - Closed fist strikes
- Cardiomegaly (heart weight 410 gms)
- Toxicology (per GBI) was positive for amphetamine (0.15mg/L) and positive for methamphetamine (2.2 mg/L) on specimens from postmortem peripheral blood.

Dr. McCormick documented some superficial abrasions consistent with a struggle, as well as two small wounds consistent with the barbs ejected from a CEW.

The Georgia Death Certificate lists cause of death as Sudden Cardiovascular Collapse secondary to Probable Excited Delirium with Physical Restraint Use and Acute Methamphetamine Intoxication. Manner of death is categorized as "Undetermined", as the relationship, if any, of the CEW use as contributory to this death was determined to be unknown.

**DISCUSSION:**

In evaluating medically-related cases in the corrections environment, there are two elements to consider. One is the overall operation and provision of medical care in a given facility, incorporating responsibilities of both the security staff as well as the medical staff. The other aspect is the medical care provided by medical staff, assuring it meets standards of care for both the facility perspective as well as medical community standards of care. The yardstick publication for the overall provision of jail healthcare is authored by the National Commission on Correctional Health Care (NCCHC). They have a published book, *Standards for Health Services in Jails*, which delineates the manner in which health services should be managed and delivered in the corrections environment. Standards are considered either "Essential", which require 100% compliance for accreditation and "Important", which require >85% compliance. Accreditation is offered to facilities by NCCHC, which involve periodic inspections and audits of the medical unit within a given facility. Whether or not a facility is accredited, the NCCHC standards still serve as the published standard by which the provision of healthcare in the corrections environment should be performed. It is my understanding that the Fulton County Jail is accredited by the NCCHC, making these standards binding based on accreditation and likely by contract.

As such, my findings include the following:

1. The failure of information relative to Mr. May's drug problems and drug-induced psychotic behavior, as documented on the medical clearance form Grady Hospital, to be communicated immediately and directly to a jail medical provider (physician or advanced practitioner) for actionable medical orders, medical observation and necessary treatment constitutes a breach of the standard of care in correctional medicine as well as NCCHC Standards (Standard J-E-02 *Essential*).
2. The failure to communicate Mr. May's claim of suicidal ideation (with or without plan) in the Intake Medical Screening to the appropriate medical or mental health provider upon intake for actionable medical orders, mental health evaluation and ongoing medically supervised observation is a breach of the standard of care in correctional medicine as well as NCCHC Standards (Standard J-B-05 *Essential*).
3. The failure to communicate the findings of Mr. May's urine drug screen on intake (positive for amphetamine, MDMA and methamphetamine) to a medical provider for actionable medical orders and appropriate observation constitute a breach of the standard of care in correctional medicine as well as NCCHC Standards (Standard J-E-02 *Essential*).
4. Having been provided with pre-incarceration medical clearance documents from Grady Hospital annotating acute drug abuse issues and drug-induced psychotic behaviors, as well as urine drug

testing done by NaphCare on site confirming same, the failure of NaphCare staff to provide appropriate proactive medical and behavioral health observation, treatment and precautions for Mr. May's methamphetamine intoxication, irrational and psychotic behaviors and documented suicidal ideation is a breach of the standard of care in correctional medicine and NCCHC Standards (Standard J-E-02 *Essential*).

5. When the post-use of force examination was requested following Mr. May's decontamination, a medical staff member identified as David Didier, a Physician's Assistant, responded to the Property/Inmate dress out area on video. The video demonstrates a very cursory visual examination and on video objectively appears to be dismissive; there were no vital signs taken and it does not appear that he had any dialogue at all with Mr. May to inquire about any physical/medical complaints. The required equipment should be brought to the patient when such an exam is requested, as these are requirements of such an assessment. He left the area and did not return until deputies discovered that Mr. May had become unresponsive a short time later. As a member of the medical staff, he should have been aware of Mr. May's acute drug intoxication, behaviors that precipitated the use of force event, as well as the fact that Mr. May had been subjected to a CEW and oleoresin capsicum spray to the face and upper airway. With these facts in mind, a post-use of force exam should, at a very minimum, include assessment of vital signs (including oxygen saturation $-SaO_2$), assessment of his mental status, auscultation of breath sounds and evaluation of wounds from the CEW use. Documentation of these items should be required on a post-use of force examination document; no such report was included in the medical records provided. As such, this brief and insufficient evaluation would not be considered standard of care for this type of situation.

**CONCLUSIONS:**

It is my expert opinion that had Mr. May been appropriately screened and examined with the correct and prompt follow through by NaphCare medical staff, to include immediate classification to suicide watch and to have appropriate sedation ordered for his methamphetamine-induced psychotic behavior, the events that transpired and culminated in an episode of excited delirium and subsequent sudden cardiac death-further exacerbated by use of force secondary to his untreated psychotic behaviors-would in all medical probability not occurred. Clinicians in this setting should be anticipatory of the possibility of deterioration in agitated and/or violent detainees that are intoxicated with drugs of this class. Drugs of the benzodiazepine class are excellent first treatment options in such cases to mitigate these agitated and violent behaviors. The phenomenon of Excited Delirium is well described in the medical literature and is associated with intense sympathetic nervous system overactivity and is clearly associated with certain abused substances. Extremely violent behavior, persistence and physical strength often considered greater than normal. This can be further exacerbated by confrontation/use of force, making prompt and proactive medical intervention essential. With the involved parties having this knowledge available to them from Grady Hospital, Intake Screening and again by a NaphCare drug screen, the failure to act on the totality of the above five items is egregious and meets the standards for deliberate indifference and thus directly attributable to the escalation of force used and ultimately his death.

**Page 6**

The opinions offered herein are based on my professional education, training, experience, and references cited. If there are further documents or exhibits I have not reviewed, these are out of the purview of this report. Should these records be made available, I would be happy to review them and offer my medical expert opinion relative to this matter. As such, I reserve the right to amend this document based upon a review of any records not made available to me prior to this date.

*[signature]*

Timothy E. Hughes, MD, FACS

25 MAR 2021

EXPERT TESTIMONY, PRIOR 4 YEARS
Timothy E. Hughes, MD

Addington v. Bayou Dorchester Detention Facility
Case #. 5:18-CV-1116-EEF-MLH
U. S. District Court, Western District of LA – Shreveport Division

Moon v. Lincoln County Jail
Case #: 1:19-CV-00217-JRH-BKE
U. S. District Court, Southern District of GA

Stalley v. Florida Department of Corrections, et al
Case # 5:19-CV-00280-JSM-PRL
U. S. District Court, Middle District of FL – Ocala Division

Wells v. Plaquemines Parish, et al
Case #: 19-CV-12218
U.S. District Court, Eastern District of LA