# EXHIBIT A

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 11

```
 1                      About when did that first knowledge
 2   take place?
 3          A.     It's been -- I can't give you a
 4   specific date.  It's been over a year.  Way over a
 5   year.
 6                 I have so many cases, I can't give you
 7   a specific date.  But I -- I learned about it on the
 8   Internet.
 9          Q.     Okay.  Did you learn about it before
10   speaking with Mr. Harper or Mr. Reese?
11          A.     Yes.
12          Q.     Okay.  After learning about it -- well,
13   let me ask you this first question: what did you
14   learn about it, from the Internet?
15          A.     I just read a news report of Mr. May
16   dying in the Fulton County Jail, and use of force
17   was -- I read the report on the news.  It was a news
18   article on the Internet.
19          Q.     Okay.  Do you know the source of that
20   news article?
21          A.     Repeat that?  I didn't hear you.
22          Q.     Certainly.  And I'm sorry I interrupted
23   you again, I think.
24                 Do you know the source of that news
25   article? -- what entity published it?
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                      May 19, 2021

Page 12

```
 1          A.    I believe -- "Killed by the Police."
 2   It's a Internet -- it's a Internet website --
 3          Q.    Do you know the --
 4          A.    -- that lists all the killings that --
 5   in the hands of law enforcement.
 6          Q.    Okay.  Do you know the URL for that
 7   website, Mr. Foster?
 8          A.    Can you say that again?
 9          Q.    Certainly.  Do you know the URL for
10   that website?
11          A.    No.  I don't -- I don't know, no.  I do
12   not.  I think it's "Killed by the Police," or
13   something like that.  I don't go on that website very
14   often.
15          Q.    That was going to be my next question.
16                Do you retain business through the
17   website "Killed by Police"?
18          A.    No.  No, I don't retain business from
19   the website.
20          Q.    All right.  After learning about this
21   article -- or after learning about this case from an
22   article on "Killed by Police," what's the next thing
23   you remember learning about this case?
24          A.    I had reached out to -- I believe it
25   was Mr. Harper.  That's my best recollection.
```

Page 13

```
 1          Q.     Okay.  And do you recall approximately
 2   when you reached out to Mr. Harper?
 3          A.     No.  I don't recall the date.  I don't
 4   recall the date or time.  It's been over -- way over
 5   a year.
 6          Q.     Okay.  All right.
 7                 When you reached out to Mr. Harper, did
 8   you do it via e-mail, or did you do it through a
 9   phone call, or -- let me ask this question.  Let me
10   strike that and ask this question: how did you reach
11   out to Mr. Harper?
12          A.     I'm not sure if it was e-mail, or -- I
13   didn't -- or phone call.  I'm not sure.
14          Q.     Okay.  Mr. Foster, going back one quick
15   question, do you currently possess any copies of that
16   article that you reviewed on the "Killed by Police"
17   website?
18          A.     No, I don't.
19          Q.     When you reached out to Mr. Harper
20   about this piece of litigation at some point more
21   than a year ago, what did you discuss with him about
22   it?
23          A.     I don't recall specifically what I
24   discussed.  I reach out to a lot of attorneys, and
25   I -- if I see a case that's -- that I believe that
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 32

 1    another question about the expert report which we

 2    just looked at, which is Global 58 that you have in

 3    front of you.

 4              Since March 25th, 2021, have you made

 5    any changes to that report?

 6         A.    No.

 7         Q.    Since March 25th -- did I say 25th?

 8    I'm sorry, Mr. Foster.

 9              Yes, March 25th.  Since March 25th,

10    have you come to any additional opinions about this

11    case that are not reflected in this report?

12         A.    No, I have not.

13         Q.    Okay.  Since March 25th, have you

14    reviewed any material regarding this case?

15         A.    Since I did my report, no, I have not

16    reviewed additional material.

17         Q.    Thank you, Mr. Foster.

18              Mr. Foster, when you were retained in

19    this case, you approached it without any bias; is

20    that correct?

21         A.    Any bias?

22         Q.    Yes, sir.

23         A.    I was -- no, I didn't have any bias

24    towards the case.

25         Q.    Thank you, Mr. Foster.  That's exactly

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 33

1   what I fully expected, and you answered my question.

2             You didn't approach -- when you were

3   retained in this matter, you approached this case

4   without any preconceived notions; is that correct?

5        A.    That's correct.

6        Q.    Okay.  Mr. Foster, you understand that

7   your role in this matter was to gather all the

8   necessary information, evaluate it using your

9   expertise, and reach whatever opinions that you

10  thought the information supported; is that correct?

11       A.    I'm -- repeat that question?

12       Q.    You understand that your role in this

13  case was to gather all the necessary information,

14  evaluate that information using your expertise, and

15  then reach whatever opinions you thought the

16  information supported; is that correct?

17       A.    Yes.  That's what I normally do.

18       Q.    Excellent.  And is that what you did in

19  this case?

20       A.    Yes.  I gather what -- the information

21  that I received, and I gave my opinion based off my

22  experience, and my training, and the facts that I

23  received from this case.

24       Q.    Okay.  And you give your opinion

25  regardless of whether your opinion would help or hurt

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 44

1    relied in forming your expert opinions."

2              Do you see that?

3         A.    Yes.

4         Q.    Did you provide -- and I want to make a

5    distinction between material that Mr. Harper may have

6    provided to you, and material that you provided to

7    Mr. Harper.  I'm only interested in material you

8    provided to Mr. Harper.

9              Did you provide any material to

10   Mr. Harper about this case, that he did not provide

11   to you originally?

12        A.    I don't recall providing Mr. Harper any

13   material about this case.

14        Q.    Okay.  All right, did you rely on any

15   documents, when you formed your expert opinions,

16   aside from what Mr. Harper provided you?

17        A.    No.

18        Q.    Okay.  Mr. Foster, I'm going to skip

19   No. 4 and I want to point out No. 5:  "Copies of all

20   articles, treatises, publications or presentations

21   that you have authored, presented, or contributed

22   to."

23              Did you provide any treatises,

24   publications or presentations, that you authored,

25   presented or contributed to, to Mr. Harper?

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 45

 1          A.      No.  I don't recall doing that.

 2          Q.      Okay.  Is there any -- are there any

 3    documents that would refresh your recollection as to

 4    whether or not you did provide any of those articles,

 5    treatises, publications or presentations to

 6    Mr. Harper?

 7          A.      If you have any document, please

 8    refresh my recollection.

 9          Q.      I don't.  I'm hoping you do, sir.

10          A.      No.  I do not.

11          Q.      Okay.  Mr. Foster, No. 6 is, "Copies of

12    all articles, treatises, publications or

13    presentations upon which you relied in forming your

14    opinions about this case."

15              Did you rely on any articles,

16    treatises, publications or presentations in forming

17    your opinions about this case?

18          A.      No.

19          Q.      Okay.  Mr. Foster, do you keep time

20    records relating to your work?

21          A.      Do I keep time records?

22          Q.      Yes, sir.

23          A.      What do you -- what do you -- I

24    don't -- explain "time records."  I don't know --

25          Q.      Yes.  I understand that you have a

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 46

1   retainer agreement with Mr. Harper in this matter.

2   Do you keep records of the amount of time you spend

3   working on a case?

4        A.    Yes, when it goes over 16 hours, I do.

5        Q.    Okay.  Have you spent 16 hours on this

6   case?

7        A.    No.

8        Q.    Okay.  How many hours have you spent on

9   this case?

10       A.    I don't have a -- I don't keep a

11  running log.  I could give you my best estimate,

12  which is 10 to 15 hours.  Between that.

13       Q.    Okay.  Does 10 to 15 hours represent

14  all of the work you performed in this case?

15       A.    Yes.

16       Q.    Okay.  Have you performed any work on

17  this case that's not included in that 10 to 15 hours?

18       A.    No.

19       Q.    Okay.  Mr. Foster, I want to talk about

20  your history.

21             And you know what?  Before we do that,

22  we've been at this for about an hour and 20 minutes,

23  including some breaks.  I forgot to mention, if

24  there's -- at any point you'd like to take a break,

25  please let me know and we'll accommodate you.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                              May 19, 2021

Page 49

```
 1                  Do you see that page?

 2         A.     Yes.

 3         Q.     Okay.  I want to go over these cases

 4   real briefly.

 5                  In the Delphine Taylor versus WMATA

 6   case that you identified, you indicate here that you

 7   testified on behalf -- or that you gave a deposition,

 8   or testified at trial, on behalf of plaintiff; is

 9   that correct?

10         A.     Yes.

11         Q.     Okay.  Did you give deposition in that

12   case?

13         A.     I did a deposition.  That case is

14   still -- far as my knowledge, it's still going on.

15         Q.     Okay.  So you've not testified at

16   trial; is that correct?

17         A.     Not yet.

18         Q.     Okay.  Mr. Foster, tell me about that

19   case.  What was your -- what was that case about?

20         A.     That case was a -- the use of force

21   case.  Ms. Taylor was a patron -- she was traveling

22   on the D.C. subway system -- the Metro system.  And

23   she was stopped by the police and she was handcuffed.

24                  She didn't put up any resistance, but

25   the handcuff that the officer use, caused her great
```

Page 50

```
 1    pain and permanently damaged her hand, which she had

 2    to have surgery, and lost the use of her hand,

 3    because they applied the handcuff extremely too

 4    tight.

 5              After she complained that the handcuff

 6    was tight, they didn't do anything about it.  And

 7    they kept her in that restraint for over two hours --

 8    two to three hours.  And she wind up -- they wind up

 9    damaging nerve and ligaments in her thumb and finger

10    by the use of the handcuff.

11        Q.    Okay.  Thank you, Mr. Foster.

12              So am I correct that that case involved

13    an arrest?

14        A.    Yes.

15        Q.    Okay.  And were you -- did you provide

16    expert testimony on police procedure, in that case?

17        A.    Yes.

18        Q.    Okay.

19        A.    In the deposition.

20        Q.    In the deposition.  Thank you,

21    Mr. Foster.

22              The next case on our list is State

23    versus -- State of Florida versus Rhonda White-Scott.

24              Do you see that?

25        A.    Yes.
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                              May 19, 2021

Page 52

1        A.    Yes.

2        Q.    Did you give a deposition in that case?

3        A.    Yes.

4        Q.    And when did you give that deposition?

5        A.    It was -- I believe it was in 2020,

6   before the -- no, excuse me.  2019.

7        Q.    Okay.  Did you testify at trial in that

8   case?

9        A.    No.  That case was settled.

10       Q.    Tell me about this case, Mr. Foster.

11       A.    Crystal Jackson was a inmate with

12  Inmate Services.  She was being transported from

13  California back to Mobile, Alabama.  It was a private

14  prisoner transport case.

15              And she was sexually assaulted,

16  multiple times, during a four-day trip to the jail by

17  the Inmate Services.

18       Q.    And --

19       A.    She was raped by -- while being

20  transported with other inmates, by the person that

21  was transporting her.

22       Q.    Mr. Foster, you mentioned that she was

23  an inmate.  Had she been convicted of a crime, at the

24  time of this incident?

25       A.    No.  But she was in the custody.  She

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 61

```
 1          testimony.  I recognize police and sheriff's

 2          deputies as law enforcement officers.

 3          Q.    (By Mr. Loegel) Okay.  You know, I

 4    might be able to clarify this.

 5                You mentioned before, Mr. Carter was

 6    shot 17 times; is that correct?

 7          A.    Yes.  That -- about that many times.

 8          Q.    So am I correct that some of the shots

 9    were fired by sheriff's deputies, and some of them

10    were fired by police officers?

11          A.    It was fired by sheriff deputies.

12          Q.    Okay.  So he was not shot by any police

13    officer, in that case.

14          A.    Not that I recall.

15          Q.    Okay.  Mr. Foster, my next question is,

16    how many of these six cases that we're discussing

17    involved a correctional environment?

18                And do you understand my question, of

19    what a correctional environment is?

20          A.    Yes.

21          Q.    How many of these involved a

22    correctional environment?

23          A.    Let's see.  One, two -- two cases.

24          Q.    And which two, Mr. Foster?

25          A.    Ms. Taylor versus WMATA, and Crystal
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 62

```
 1    Jackson versus Inmate Services.
 2          Q.     Okay.  And going back to Taylor, I
 3    understand that was a police arrest case; is that
 4    correct?
 5          A.     Yes.
 6          Q.     And so did that involve -- was that
 7    arrest made in a jail, or in a correctional facility?
 8          A.     No.  It was made on the streets of
 9    Washington.  In the subway of Washington, D.C.
10          Q.     Okay.  And do I understand Crystal
11    Jackson involved -- you write here "corrections and
12    jail procedures," correct?
13          A.     Right.
14          Q.     And that was corrections and jail
15    procedures by Inmate Services Inc.; is that right?
16          A.     Yes.
17          Q.     Okay.  And it involved a transport of
18    an individual, correct?
19          A.     Yes.
20          Q.     Okay.  Mr. Foster, of these six cases,
21    how many times have you testified on behalf of the
22    state in the criminal matters?
23          A.     In these cases, none.
24          Q.     How many times have you testified on
25    behalf of a defendant -- in those six cases, how many
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 64

```
 1          A.     Yes.

 2          Q.     And you represented Ms. Jackson?

 3          A.     Yes.

 4          Q.     Okay.  And in Rudy Joseph versus City

 5   of Tallahassee and Officer Damon Miller, that was a

 6   civil case; is that correct?

 7          A.     Yes.

 8          Q.     And you represented Mr. Joseph?

 9          A.     Yes.

10          Q.     Okay.  And in Hattie Reynolds versus

11   the City of Daytona Beach, that was a civil case,

12   wasn't it?

13          A.     Yes.

14          Q.     And you represented Ms. Reynolds?

15          A.     Yes.

16          Q.     Mr. Foster, looking at this list, am I

17   correct that, in the cases you have testified in, the

18   only one involving correction, and use of force, was

19   Crystal Jackson versus Inmate Services; is that

20   correct?

21          A.     According to that list, yes.

22          Q.     Are there other cases that you've

23   testified in as an expert witness that involved

24   corrections and use of force, that aren't on this

25   list?
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 65

```
 1              A.      There is a case that I recall now.

 2      It's -- that's not on that list.  It's a juvenile

 3      detention case.

 4                      I was -- gave a deposition against the

 5      State of Florida Juvenile Justice.

 6              Q.      And when did you give that

 7      deposition? -- do you recall?

 8              A.      It was -- my best recollection was

 9      2019.

10              Q.      And what was the name of -- I guess

11      what was the name of the plaintiff in that case?

12              A.      I can't recall the name of the

13      plaintiff.

14              Q.      Okay.

15              A.      But I know it was against the Florida

16      Juvenile Justice.

17              Q.      And you gave a deposition in 2019 in

18      that case, and it was a civil matter?

19              A.      Yes.

20              Q.      Okay.  And that's not on this list.

21                      And you represented the plaintiff in

22      that matter?

23              A.      Yes.

24              Q.      Tell me the circumstances of that case.

25              A.      It was a juvenile that was being
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 66

```
 1   detained by the Florida Department of Juvenile

 2   Justice in Miami, where he was told by the detention

 3   officer to fight another juvenile, and he refused.

 4              And the officer got another juvenile to

 5   start a fight, and the officer wind up -- that same

 6   officer wind up breaking up the fight and slamming

 7   the juvenile detention officer to the floor, and

 8   rendered him -- he got knocked out, unconscious.

 9        Q.     And you said you gave a deposition.

10               Did you testify at trial in that

11   matter?

12        A.     No.  I gave a deposition.

13        Q.     Okay.  And that involved a juvenile

14   custody situation, and a use of force; is that

15   correct?

16        A.     Yes.

17        Q.     And that's not on this list, is it?

18        A.     No.  Like I said, by you going over

19   this, it came to mind that I did miss that.

20        Q.     Are there any other cases that you

21   provided deposition or trial testimony in, that are

22   not on this list, that have come to your mind?

23        A.     No, no.

24        Q.     Mr. Foster, in your experience as an

25   expert, have you ever been offered any cases that you
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                May 19, 2021

Page 75

1    education, besides what we talked about?

2            A.    No.  That's it.

3            Q.    Okay.  Great.

4                  Mr. Foster, I want to go back to --

5    still on Exhibit 58, I want to ask a quick question

6    about Page 3, if you could turn to that.

7            A.    Okay.

8            Q.    If you'll look about the third

9    paragraph down, it begins with, "I manage the lagers

10   cellblock operation."

11                 Do you see that?

12           A.    Yes.

13           Q.    What is the lagers cellblock?

14           A.    It should be "large" cellblock.

15           Q.    "Large," okay.  Okay, thank you.

16                 What was your role in the large

17   cellblock operation in the U.S. Marshals Service, in

18   the D.C. Superior Court cellblock?

19           A.    I was the supervisor of the cellblock.

20   So on a daily basis, I would supervise other deputy

21   marshals, and processing housing and cells for the

22   prisoners that came in from off the street, from

23   Metropolitan Police Department, or from the D.C.

24   jail.

25                 They would come to the cellblock to

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 76

1   present in magistrate court, or for trial.  And we

2   will search, process, feed, and temporarily hold them

3   in the cellblock until they appear in a court --

4   their time to appear in court, and then we would

5   transport them back to the D.C. jail.

6          **Q.     Okay.  All right.  So your role at the**

7   **large cellblock, in the D.C. Superior Court**

8   **cellblock, was related to housing inmates and**

9   **pretrial detainees -- when they went to court?**

10                 **Is that accurate?**

11         A.     Yes.  The D.C. Superior Court cellblock

12  is the largest cellblock in the Marshal Service, as

13  far as the volume of prisoners and detainees.

14         **Q.     And who did you report to in that role?**

15         A.     My chief deputy.

16         **Q.     Okay.  And who did the chief deputy**

17  **report to?**

18         A.     The U.S. Marshal -- appointed

19  U.S. Marshal.

20         **Q.     Okay.  And how many people reported to**

21  **you in your role at the large cellblock?**

22         A.     At the D.C. Superior Court cellblock,

23  20 to 30 people.

24         **Q.     Okay.  And --**

25         A.     Given on a specific date.  Sometimes it

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 77

```
 1   could be 20 people; sometimes it could be 30 people,

 2   depending on the number of inmates we receive on that

 3   day.

 4        Q.     Okay.  Did you have direct reports in

 5   that role?

 6        A.     What do you mean by "direct report"?

 7        Q.     Of those 20 or 30 people that you

 8   mentioned, did some of them report directly to you,

 9   and others reported to those people, in a chain of

10   command?

11        A.     Everybody that worked in the cellblock

12   reported to me.  I was responsible for the care, the

13   transportation, and appearance in court for all the

14   inmates.

15               So anything -- any incident happen, it

16   would have came under my responsibility.

17        Q.     Okay.  All right.  Were the people who

18   reported to you -- were they detention officers?

19               What was their rank?

20        A.     There were detention officers, there

21   was Deputy U.S. Marshals, and there was guards that

22   we hired that -- retired police officer, or active

23   officers that we hired on a daily basis.

24               So that's why I keep saying, the

25   numbers could be 20 to 30 on a given day, depending
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                      May 19, 2021

Page 78

```
 1   on who we assigned to come to work that day.
 2        Q.    Okay.  And how long did you hold that
 3   role in the large cellblock operation?
 4        A.    From 2008 -- excuse me -- 2009, till
 5   2013.  The end of 2013.
 6        Q.    Okay.
 7        A.    Well, I would say I -- I managed --
 8   between that time in D.C. Superior Court, if I wasn't
 9   managing the cellblock for a year, we rotated, and I
10   did two -- I stayed the longest time in that
11   position: two years.
12              And then I rotate to prisoner
13   operations, which that details in moving,
14   transporting up prisoners, and then I'd rotate back
15   into the cellblock.
16        Q.    Okay.  Is it accurate, then, that you
17   spent two years overseeing the large cellblock?
18        A.    No.  That's not accurate.  I would say
19   I spent -- out of the four or five years, from
20   2019 -- 2009 to 2013 -- I think that's, what? -- four
21   years? five years? -- I spent probably three.
22        Q.    Okay.
23        A.    Three and a half years.
24        Q.    Okay.  You were also employed at the
25   juvenile jail in Broward County, Florida, at some
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 85

1          Q.      And so you taught the class on police/

2    subject threat assessment encounters, continuing

3    legal education for attorneys, on April 13th, 2019;

4    is that correct?

5          A.      Yes.

6          Q.      Okay.  And what about the OC spray for

7    Officers, in 1988? -- you taught that as well?

8          A.      Yes.  I taught that as a training for

9    officers.

10         Q.      Okay.  Since 1988, how many times have

11   you taught that OC spray class?

12         A.      I haven't taught it at all since that

13   time.

14         Q.      Okay.  Since April 2019, how many times

15   have you taught the police/subject threat assessment

16   encounter class?

17         A.      I haven't put on another course.

18   That's a course I developed, that I have a copyright

19   to, and I haven't put on another course.

20         Q.      Okay.  Bear with me one second.

21                Mr. Foster, I'm going back to what we

22   previously marked as Exhibit 59.

23                Do you see that?

24         A.      Yes.

25         Q.      And do you see where it says, "Copies

Page 96

```
 1                 And for the court reporter's

 2   clarification, that appears to be a photograph from

 3   one of the disciplinary files of one of the

 4   defendants.

 5                 Is that where you found that

 6   photograph?

 7        A.    Yes.

 8        Q.    Okay.  That chair, what is that,

 9   Mr. Foster?

10        A.    That is a restraint chair.

11        Q.    Okay.  Very good.

12                 When were you first trained on that

13   type of chair?

14        A.    Well, the training I received was that

15   certification I showed you, but I made sure --

16        Q.    And the --

17        A.    Let me finish.

18                 I made sure that the people I supervise

19   was trained on the use of this particular chair,

20   because the Marshal Service -- we went to this

21   particular chair when I was a supervisor in the

22   cellblock.  So I made sure the people who was going

23   to use it -- or are authorized to use it, got the

24   proper training, and followed our policy.

25                 Matter of fact, I was the one that
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 97

1  ordered the chair, for my office to -- I'm the one

2  that authorized the purchase of that chair, and made

3  sure that my deputies and detention officers was

4  trained on how to properly put somebody in that

5  chair, and use -- and use the chair -- when to put

6  somebody in the chair, and how long to keep them in

7  that chair.

8          **Q.    Okay.**

9          A.    So I reviewed my agency policy -- my

10  district policy on the use of that chair, and made

11  sure that the individual that I supervised was

12  properly trained.

13               Me personally, I showed you my

14  certification on the restraint chair.

15         **Q.    Okay.**

16         A.    That's my personal training.

17         **Q.    So I just want to clarify.**

18               **Your only personal training on the use**

19  **of a restraint chair, was this certification you got**

20  **in 2017, correct?**

21         A.    Yes.

22         **Q.    Okay.  That's what I needed.  Thank you**

23  **Mr. Foster.  I appreciate all that information.**

24               **Let me ask this: are you a certified**

25  **restraint chair trainer?**



The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                        May 19, 2021

Page 98

```
 1          A.     No.
 2          Q.     Okay.  Are you familiar with an
 3   organization called the Georgia Peace Officer
 4   Standards Training Council, or POST?
 5          A.     I'm familiar with the Georgia POST,
 6   yes.
 7          Q.     Are you POST-certified?
 8          A.     No, I'm not.
 9          Q.     Okay.  Mr. Foster, have you ever
10   written any articles on the use of a TASER?
11          A.     No.
12          Q.     Have you ever written any articles on
13   the use of -- I'm going to call it "OC spray," but
14   it's oleoresin capsicum spray.
15                 Are you familiar with that?
16          A.     Yes.
17          Q.     Have you ever written any articles on
18   the use of OC spray?
19          A.     No.
20          Q.     Had you ever written any articles on
21   the use of restraint chairs?
22          A.     No.
23          Q.     Have you ever written any articles on
24   the use of transport chairs?
25          A.     No.
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 121

```
 1                    Number two is the Fulton County

 2    Sheriff's Office standard operating procedure, use of

 3    force, No. 1.01; and No. 9 is Fulton County Sheriff's

 4    Office, General Order 2009-6, safety restraint check.

 5                    Do you see that on your report?

 6         A.    Yes, sir.

 7         Q.    Did you review any other policies in

 8    formulating your opinion in this case?

 9         A.    I looked at the Gwinnett County policy,

10    but that didn't help me form my opinion.

11         Q.    Why didn't it help you form your

12    opinion?

13         A.    Because we're talking about Fulton

14    County Sheriff Department.

15         Q.    Okay.  Any other reason why that didn't

16    help you form your opinion, or is that all?

17         A.    Well, I don't think Fulton -- Gwinnett

18    County is on trial.  These deputies are Fulton County

19    deputies, and they should go by Fulton County policy.

20    That's what they was disciplined for.

21         Q.    Okay.  Mr. Foster, does your report

22    identify any correctional standards of care?

23         A.    No.  No, it doesn't.

24         Q.    Okay.  Mr. Foster, are you familiar

25    with the American Correctional Association?
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 122

```
 1          A.     Yes, sir, I am.
 2          Q.     Are you a member?
 3          A.     No.
 4          Q.     Do you know whether that organization
 5   has any standards for correctional institutions?
 6          A.     They have a -- they do have a -- a
 7   guidance.  And they have, I guess -- they have
 8   guidance for correctional institute, you know.
 9                 Recommendations and guidance.
10          Q.     Okay.  Did you reference any ACA
11   recommendations or guidance for standards in your
12   report?
13          A.     In my report.
14                 No.  I don't think so.
15          Q.     Okay.  Mr. Foster, are you familiar
16   with the American Jail Association?
17          A.     Yes.
18          Q.     Are you a member of that organization?
19          A.     No, I'm not.
20          Q.     Did you reference any American Jail
21   Association policies or recommendations in your
22   report?
23          A.     No, I did not.
24          Q.     Mr. Foster, are you familiar with a
25   treatise called "Performance-Based Standards for
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 123

1    Adult Local Detention Facilities," 4th Edition?

2         A.    I'm not familiar with that.

3         Q.    Okay.  Mr. Foster, are you familiar

4    with an organization called the Commission for

5    Accreditation of Law Enforcement Agencies?

6         A.    Yes.

7         Q.    Are you a member of CALEA?

8         A.    No individual's a member; only agencies

9    are.

10        Q.    Okay.  Did you mention any CALEA

11   recommendation for standards in your report?

12        A.    Nope.

13        Q.    Okay.  Are you familiar with the

14   National Commission on Correctional Healthcare?

15        A.    Yes.

16        Q.    Did you mention any National Commission

17   on Correctional Healthcare standards or

18   recommendations in your report?

19        A.    No.

20        Q.    Are you familiar with the National

21   Sheriff's Association?

22        A.    Yes.

23        Q.    And are you a member of the National

24   Sheriff's Association?

25        A.    I'm not a sheriff.  No.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                          May 19, 2021

Page 124

1        Q.      Okay.  Did you mention any National

2    Sheriff's Association recommendation or standards in

3    your report?

4        A.      No, I did not.

5        Q.      Okay.  Thank you.

6                Mr. Foster, tell me all the people that

7    you spoke to in gathering information to create your

8    report.

9        A.      I spoke to my client.

10       Q.      That's Mr. Harper?

11       A.      Yes.  And Mr. Reese.

12       Q.      And Mr. Reese, okay.

13               And what information did Mr. Harper

14   provide you that assisted you in creating the

15   opinions in your report?

16               MR. HARPER:  Object to the form of the

17          question.  Asked and answered, earlier.

18               You may answer, Mr. Foster.

19               THE WITNESS:  The list of items that I

20          have in my report, No. 12.

21       Q.      (By Mr. Loegel) Okay.

22       A.      And No. 11, I believe.  Yeah, 11.  And

23   the Internal Affairs investigation, and the

24   supplemental reports.

25               All the items that they receive on

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 125

1    discovery, that I believe that I received.

2         Q.      Can I summarize that to say, the

3    documents that Mr. Harper sent you, is how you're

4    responding to that question?

5         A.      Yes.

6         Q.      Okay.  Perfect.  Let me ask you this,

7    because I want to just clarify a few things.

8                 You just mentioned No. 11: the TASER

9    user manual for Axon.  Is that something that you've

10   had in your possession, or something that was

11   provided to you by Mr. Harper?

12        A.      I have that in my possession.

13        Q.      Okay.  Have you provided that to

14   Mr. Harper?

15        A.      No.

16        Q.      So that's another thing I'd ask that

17   you provide to Mr. Harper so he can provide to us.

18                If it's a document you relied upon in

19   the creation of your opinion, and we haven't had it

20   in response to our subpoena, I'd like to see it.

21        A.      Okay.

22        Q.      Thank you.

23                Mr. Foster, in general terms, tell me,

24   what is your process for preparing your opinions?

25   How did you go about writing these reports?

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 126

1          A.      Well, first I review the documents that
2      were sent to me, and I -- and based on -- and I
3      review policies and procedure of that agency: Fulton
4      County.
5                  I look at that, and I go back and look
6      at the actions that they took.  I use my training --
7      my knowledge from my training and experience.
8          Q.      **Anything else?**
9          A.      No.  That's pretty much it.
10         **Q.      Okay.  Thank you.**
11                 **Mr. Foster, how do you choose which**
12     **material to rely upon and which material to not rely**
13     **upon?**
14         A.      Well, materials that helped me
15     formulate was the use of force justified, or
16     incessant, so -- and that it ties into the actions
17     that law enforcement took.  I wouldn't use a -- a
18     policy that's pertaining to how to write a ticket on
19     somebody, versus some officer using a TASER.
20         **Q.      Makes sense.**
21         A.      So if I receive something that's not
22     related, and not -- and goes to the heart of the
23     issue, then I will use that.  That's either swayed me
24     left or right on how I'm going to formulate my
25     decision.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 127

1          Q.      And to use your words, material that

2     sways you left, and then material that sways you

3     right, how do you make the decision which material to

4     include in your report?

5          A.      Well, I base that -- based on my

6     experience and my training, I've come to a conclusion

7     where this is -- this is proper, or this is something

8     that, you know, go to the heart of the matter of the

9     issue that I was hired to do.

10          Q.      Okay.  And then you gather the evidence

11     that supports that -- that heart of the matter; is

12     that correct?

13          A.      Well, I don't gather the evidence.  I

14     use what's in front of me.

15               If it support my opinion of the use of

16     force, I use it.  If it doesn't support my opinion,

17     then that's something that I take in consideration

18     before formulating my opinion.

19          Q.      Okay.  Mr. Foster, in this particular

20     case, was there anything you asked to see but were

21     not provided?

22          A.      No.  Everything I asked for, I --

23          Q.      Mr. Foster, have you completed your

24     work on this case?

25          A.      I don't know.  I --

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 128

```
 1        Q.     Mr. Foster, let me strike that
 2   question.  I apologize.
 3               Have you completed your work on your
 4   expert report?
 5        A.     As of now, yes.
 6        Q.     And your report contains all of your
 7   opinions regarding this case; is that correct?
 8        A.     Yes.
 9        Q.     Okay.  Before you take the stand and
10   testify in this case, will you let me know if you do
11   any more work on this matter?
12        A.     Yeah.  I'll let Mr. Harper, or Reese,
13   yes.
14        Q.     Okay.  Mr. Harper, I want to talk about
15   the meat of your opinions next, okay?  And I want to
16   go over all of the opinions that are in your report.
17   And I believe they begin on Page 6, but I could be
18   wrong.  But because of the way you've organized your
19   report, I may miss a few.
20               So I'm going to go over every one I
21   see.  But if I miss one, at the end of this, I'm
22   going to ask you, "Did I miss any of your opinions."
23   And I'd like you to be able to tell me if I did,
24   because I want to be able to catch every opinion
25   you've offered in this report, okay?
```

Page 129

```
 1          A.      Okay.

 2          Q.      And as I'm going along and if I miss

 3    one and you want to share it, stop me and we'll go

 4    through that.

 5                  So on Page 6 -- I'm sorry.  On Page 5,

 6    rather -- and I can show it to you.  Let me pull it

 7    up.

 8          A.      Page 5?  Okay.

 9          Q.      Yes, sir.  I'm looking at the portion

10    directly below where it says "Expert Witness

11    Opinion."

12                  Do you see that?

13          A.      Yes.

14          Q.      Okay.  You were asked to opine on the

15    use of force by Officers Whitaker, Cook, Saadiq,

16    Jackson, Roache, Delacruz, Copeland and Strowder; is

17    that correct?

18          A.      Yes.  That's what I wrote.

19          Q.      All right.  Did you opine on -- were

20    you asked to opine on any use of force by any other

21    officer?

22          A.      This is what I recall.  That's what I

23    wrote.

24          Q.      Did you in fact opine on whether any

25    other officer, other than Whitaker, Cook, Saadiq,
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 130

1    Jackson, Roache, Delacruz, Copeland or Strowder, may

2    have used force.

3         A.    It seemed like you asked me the same

4    question over again.

5         Q.    I am.  I'm trying to lock it down.

6         A.    What I wrote in my report, that's what

7    I opined on.

8         Q.    All right.  No one else.

9         A.    What I wrote in my report, that's what

10   I opined on.

11        Q.    Thank you.

12             Your next -- the next question I have

13   for you is a quote here where it says, "Based on my

14   training, experience and knowledge of accepted use of

15   force, it is my opinion that Fulton County Sheriff's

16   Detention Officers Jackson, Cook, Whitaker, Strowder,

17   Roache, Delacruz, Copeland, used excessive force to

18   gain compliance with Antonio May."

19             Do you see that?

20        A.    Yes.

21        Q.    Okay.  I'd like to go over what force

22   each one of these officers used, that you believe

23   was, A, a use of force; and, B, was excessive.

24             What force did Mr. Jackson use?

25        A.    So we'll be here all night.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                                May 19, 2021

Page 131

```
 1          Q.     We are, Mr. Foster.

 2          A.     I would have to go through the -- the

 3     report.  First of all --

 4          Q.     I'll --

 5          A.     Can I answer?

 6          Q.     Yes, sir.  Of course.

 7          A.     I thought you was going to say

 8     something.

 9          Q.     I was.  And let me interject, since we

10     have a moment.

11               I'll purport to you that your report

12     does not identify each use of force by each officer,

13     and that's what I'm going to ask.

14               I want to know what force Jackson used,

15     and then I'm going to ask you what force Cook used,

16     and then I'm going to ask you what force Whitaker

17     used.

18               So can you tell me what force Officer

19     Jackson used on Antonio May?

20               MR. HARPER:  Mr. Loegel, let me make a

21          quick suggestion here that may help us all

22          out, just for this part of the questioning.

23               If you give Mr. Foster a chance to look

24          at his report and look at the incident

25          reports, he may be able to better answer that
```

Page 132

```
 1        question, as opposed to answering it fresh

 2        from his recollection.

 3             I just think it would help us all.  I

 4        don't think there's an issue with him looking

 5        at -- giving him a minute.  Maybe take a

 6        five-minute break to let him kind of look at

 7        each disciplinary file and incident report to

 8        be able to answer that question.

 9             Otherwise, he's going to say he doesn't

10        recall.

11             MR. LOEGEL:  That's fine, Mr. Harper.

12        Q.    (By Mr. Loegel) And let's take five

13   minutes, Mr. Foster, for you to review whatever

14   documents in front of you you feel are appropriate,

15   so that I can -- and I'll give you a -- you know, a

16   tease on the questions.

17             I'm going to ask you what force each

18   officer used; and of that force, what you think was

19   excessive.

20             So take your time, and we'll come back

21   in about five minutes.

22             MR. LOEGEL:  Is that agreeable to

23        everyone?

24             MR. HARPER:  Yes.  Sounds good.

25             MR. LOEGEL:  All right.  Let's go off
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 133

```
 1        the record.
 2                (A short recess was taken, after which
 3        the following proceedings were had:)
 4                MR. LOEGEL:  Let's go back on the
 5        record.
 6                We're back on the record after a delay
 7        in which Mr. Foster reviewed some additional
 8        material.  I'm going to ask some general
 9        questions, and then we'll try to get into more
10        specifics.
11        Q.    (By Mr. Loegel) Mr. Foster, do you
12   allege that Officer Jackson used excessive force
13   against Mr. May?
14        A.    Yes, I do.
15        Q.    And do you allege that Officer Cook
16   used excessive force against Mr. May?
17        A.    Yes, I do.
18        Q.    And do you allege that Officer Whitaker
19   used excessive force against Mr. May?
20        A.    Yes.
21        Q.    Okay.  And you allege that Officer
22   Strowder used excessive force?
23        A.    Yes.
24        Q.    And you allege that Officer Delacruz
25   used excessive force?
```

Page 134

```
 1          A.     Yes.
 2          Q.     And do you allege that Officer Copeland
 3   used excessive force?
 4          A.     Yes.
 5          Q.     Okay.  Do you allege that any other
 6   officers used excessive force against Mr. May?
 7          A.     As far as I know, what I put in this
 8   report -- I'm trying to figure out which one is
 9   the -- the female officer.  I forgot her last name.
10          Q.     I might suggest there are two female
11   officers mentioned in your report: one is Saadiq, and
12   one is Strowder.
13          A.     Strowder, yes.  The one that entered
14   the cellblock with --
15                 MR. HARPER:  Yes.  Mr. Loegel, let me
16          just interject.
17                 THE WITNESS:  Strowder -- Strowder was
18          the one I'm talking about.
19          Q.     (By Mr. Loegel) Okay.  All right.  So
20   am I correct, then, that you don't allege that
21   Sergeant Saadiq used excessive force?
22                 MR. HARPER:  Objection.  That misstates
23          the report here.  Misstates his --
24                 THE WITNESS:  No.
25                 MR. HARPER:  -- prior testimony.
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 135

1        Q.      (By Mr. Loegel) You can answer.

2        A.      No.  I do.

3                What's -- the names that I listed

4    here --

5        Q.      Okay.

6        A.      -- does.

7        Q.      Okay.  All right, so that's what I

8    wanted to clarify.

9                I want to -- and I'm looking at the

10   portion of your report called "Expert Witness

11   Opinion."  And it says, "Based on my training,

12   experience and knowledge of accepted use of force, it

13   is my opinion that Fulton County Sheriff's Detention

14   Officers Jackson, Cook, Whitaker, Strowder, Roache,

15   Delacruz, Copeland, used excessive use of force to

16   gain compliance from Antonio May."

17               Is that an accurate statement?

18               Mr. Foster, is that an accurate

19   statement?

20       A.      Yeah.  That is accurate.

21       Q.      Okay.

22               MR. HARPER:  Mr. Loegel, I think -- and

23               if I may, I object to the form of this line of

24               questioning.  The report speaks for itself,

25               and he does mention officers by name

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 136

1        throughout the report.

2            I think the issue we're having here is

3        you're asking him questions based on his

4        recollection.  And if we go through the report

5        paragraph by paragraph, I think you'll get the

6        answer you're looking for for each individual

7        defendant.

8            MR. LOEGEL:  That's what I'm about to

9        do, Mr. Harper, and I appreciate it.

10           But I did not ask a question that

11       required an objection.  But I am grateful for

12       the opportunity and for the instruction.

13       Q.    (By Mr. Loegel) All right.  Moving on

14   to "Initial Approach," on Page 6 of the document,

15   Mr. Foster, do you see that with me?

16       A.    Yes.

17       Q.    Okay.  In the middle of that paragraph,

18   you write, "It is my opinion that the approach by

19   Officer Cook was aggressive in nature, which failed

20   to deescalate the situation, and did not give Antonio

21   May enough time to respond to the commands before

22   being TASE'd."

23           Do you see that?

24       A.    Yes.

25       Q.    All right.  Upon what are you basing

Page 137

1    this opinion?

2          A.    I'm basing that on the use of force

3    report and the video that I saw.  The video outside

4    the cellblock.

5          Q.    Okay.  Anything else?

6          A.    The incident report that I listed.

7          MR. HARPER:  Again, I have to object

8    Mr. Loegel, to taking certain parts -- I know

9    you're entitled to ask whatever questions you

10   want.  But to pick a particular sentence, you

11   know, out of a paragraph that tries to explain

12   his opinion, I think is -- I'm objecting to

13   the form of that.

14         MR. LOEGEL:  Okay.  Let me do this: I

15   will accept your objection to form as a

16   standing objection, because I intend to do

17   that.

18         The problem I face is that Mr. Foster's

19   report does not identify report -- any

20   particular opinion.  I've had to go through it

21   line by line to find his opinions, and try to

22   get him to clarify them.  That's what I intend

23   to do.

24         But I'm happy to accept your standing

25   objection that I'm going to call out

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 139

```
 1                    That's a opinion of mine.

 2          Q.     I understand it's your opinion.  I want

 3   to know upon what you're basing that opinion on.

 4                    And I don't want -- we've moved on from

 5   asking you about each particular officer and their

 6   use of force in that form.  We're going to go

 7   through, like Mr. Harper said, and look at each of

 8   these sentences.

 9                    But that's exactly my question.

10   Mr. Foster.  You write, "It is my opinion that the

11   approach by Officer Cook was aggressive in nature,

12   which failed to deescalate the situation, and did not

13   give Antonio May enough time to respond to the

14   commands before being TASE'd."

15                    I want to know what evidence you rely

16   on in coming to that opinion.

17          A.     I relied on the video outside of the

18   cellblock.  I relied on the incident report that

19   Officer Cook did; also incident report from other

20   officers.

21          Q.     Okay.  Anything else?

22          A.     TASER report.

23          Q.     Tell me what the TASER report is.

24          A.     What I mean by the TASER -- him -- I

25   shouldn't say "TASER report."
```

Page 140

1                    The TASER was deployed.  That's what I

2    meant.  The ways the TASER was deployed, and the use

3    of force report.  That doesn't depict the actions

4    that was taken by Cook when he deployed his TASER.

5          Q.    Mr. Foster, I think --

6          A.    And it contradicts other officers in

7    the incident report.

8          Q.    I think we're getting somewhere.

9                Am I correct that your opinion on that

10   sentence that we've read a couple times, is based on

11   the material -- is based on the incident report, the

12   use of force report of Mr. Cook, the use of force

13   report of others, the incident report of others, and

14   the video; is that correct?

15         A.    Yes.

16         Q.    Okay.  Is there anything else that you

17   relied on in forming that opinion?

18         A.    My experience.

19         Q.    Okay.  Anything else?

20         A.    That's it.

21         Q.    Okay.  Did you review any of the

22   deposition testimony of any of the parties involved

23   in this case?

24         A.    No, I did not.

25         Q.    Okay.  If the deposition testimony

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                May 19, 2021

Page 141

1   differed from the material that you've identified

2   here, would it change your opinion?

3            MR. REESE:  Object to the form.  I

4        think there's no way to answer that question

5        without knowing what the deposition testimony

6        says.

7            MR. LOEGEL:  Yes.  Listen, I mean --

8            MR. REESE:  Speculation.

9            MR. LOEGEL:  Well, he's an expert

10       witness, Mr. Reese.  Speculation is why we're

11       paying him.

12           That said, I will strike the question

13       and rephrase it.

14       Q.   (By Mr. Loegel) Mr. Foster, if the

15   evidence showed that Officer Cook felt threatened,

16   would that change your opinion as to whether or not

17   his initial TASE'ing was an excessive use of force?

18       A.   I can't answer that question.  Because

19   what I saw on the video of Cook standing outside the

20   cellblock, with several officers who already entered,

21   I couldn't imagine he'd have been that much -- I

22   couldn't imagine he'd be threatened from an unarmed

23   person.

24           So I couldn't opine on that -- that

25   evidence wouldn't be something that I -- I would use

Page 142

1  to formulate my opinion.  Because from what I

2  observed, from the outside, of several officers

3  stacked up to enter a small cell, how can any one of

4  them feel threatened of a unarmed person, with their

5  TASER out.

6        Q.    Okay.

7        A.    So . . .

8        Q.    Let me ask my next question.  And I

9  want to step back a minute from the actual testimony.

10             You've mentioned in your report, on a

11  number of occasions -- at a number of points, that it

12  is your opinion that various officers used excessive

13  force; is that correct?

14       A.    Yes.

15       Q.    Okay.  What are you basing your opinion

16  that they used excessive force on?

17       A.    The actions.

18       Q.    Okay.

19       A.    The actions of -- what the officer

20  took.  You don't TASE somebody eight times.  That's

21  excessive.

22       Q.    Mr. Foster, is it your opinion that

23  excessive force is a violation of the statute?

24             MR. HARPER:  Object to the form.  Calls

25        for a legal conclusion.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                      May 19, 2021

Page 145

```
 1         A.    Yes, I did.  Yes, I did.  I just don't
 2   recall that question.
 3         Q.    Do you see the middle of this page,
 4   where it says, "Mr. Foster, are you admitted to the
 5   bar in any state?"
 6         A.    Right.  I see the question, and I said
 7   "no."
 8         Q.    Yes.  And is that still true and
 9   correct?
10         A.    That's correct.
11         Q.    Okay.  And you testified under oath in
12   this deposition, right?
13         A.    Yes.
14         Q.    Okay.  Mr. Foster, the question in this
15   one is, "Have you ever been to law school?"
16               Do you see that?
17         A.    Right.
18         Q.    And you answered "no"?
19         A.    Yes.  I answered "no."  That's correct.
20         Q.    Okay.  Mr. Foster, next, I'm going to
21   ask -- the question you were asked was, "Is it your
22   opinion that it is" -- "Is it your opinion, or is it
23   your position, that you're an expert on the
24   application of the 4th, 5th, 8th or 14th Amendments
25   in the Ninth Circuit of the United States?"
```

Page 146

 1                    And do you see your response?

 2          A.    "THE WITNESS:  I'm not saying that I'm

 3    an expert in that, no,"

 4          Q.    Okay.  Do you consider yourself an

 5    expert in the 4th, 5th, 8th or 14th Amendments, in

 6    the 11th Circuit of the United States?

 7                    MR. HARPER:  Object to the form.

 8          Q.    (By Mr. Loegel) You can answer.

 9          A.    I stand by that question.  I'm not a

10    expert in the 4th, 5th, 6th, 8th -- any amendment.

11    I'm not a expert in any of the amendments in the

12    United States.

13                    MR. HARPER:  Let me object to the form.

14          I'm going to object to the form --

15                    MR. LOEGEL:  I have no question

16          pending, Mr. Harper.

17                    MR. HARPER:  I'm sorry?

18                    MR. LOEGEL:  I said, I have no question

19          pending.  Your objection is simply an

20          opportunity to speak.

21               This is my deposition.  I'd appreciate

22          it if you wait for me to ask a question before

23          you object.

24                    MR. HARPER:  Well, I objected to the

25          question before he answered, and I'm going to

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 147

1    state the objection for the record.

2         Mr. Foster is not an attorney, as you

3    just clarified there.  And the question calls

4    for a legal conclusion.

5         He is here to opine on his experience

6    involving excessive force.  He may not know

7    that that particular term is under a

8    particular amendment of the Constitution.  I

9    think it's an inappropriate question that's

10   outside of what he's here to testify about.

11        He's not here to testify about what

12   amendment of the Constitution stands for

13   excessive force, but he is here to testify

14   about what excessive force means, based on his

15   experience.

16        And based on that objection, I object

17   to that question, again, because it calls for

18   a legal conclusion.

19        MR. LOEGEL:  Would you be willing to

20   admit on the record that Mr. Foster is here to

21   testify about excessive force?

22        MR. HARPER:  Absolutely right.  But

23   he's not here to talk about particular

24   amendments under the US Constitution.

25        MR. LOEGEL:  Thank you, Mr. Harper.  I

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                                    May 19, 2021

Page 149

1    don't know if that question was asked.

2         Q.    Understood.

3         A.    I don't recall that.

4         Q.    I understand you don't recall.

5               Do you consider yourself now an expert

6    in the legal standard of negligence?

7               MR. HARPER:  Object to the form.  It

8         calls for a legal conclusion.  The deponent's

9         here to testify about excessive force.

10              You may answer.

11              THE WITNESS:  Your question is if I'm a

12        expert in a legal standard of -- I'm a expert

13        in the use of force.

14        Q.    (By Mr. Loegel) Okay.

15        A.    That's my --

16        Q.    So am I correct, then, that you're not

17   an expert in the legal standard of negligence; is

18   that correct?

19              MR. HARPER:  Object to the form.

20              THE WITNESS:  I never proffered myself

21        as an expert in the legal standards of

22        negligence.

23        Q.    (By Mr. Loegel) Thank you.  Thank you,

24   Mr. Foster.

25              Mr. Foster, do you make any citations

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 150

 1    to any case law in your report?

 2         A.    I think I referenced Graham versus

 3    Connor.

 4         Q.    Can you point me to where you reference

 5    Graham versus Connor in your report?

 6         A.    I'm looking through my report.

 7               No.  I don't see that I reference it.

 8         Q.    Do you reference any case law in your

 9    report, Mr. Foster?

10         A.    No.  I did not reference any case law.

11         Q.    Do you reference any legal standards in

12    your report, Mr. Foster?

13         A.    No.  I do not reference any legal

14    standard.

15         Q.    Okay.  You testified earlier that you

16    review the evidence that you're provided and form

17    your opinion from it.

18               Do you remember testifying to that?

19         A.    Yes.

20         Q.    If there were contradictory evidence to

21    the evidence that you have relied on, would you like

22    to see it?

23               MR. HARPER:  Object to the form.

24               THE WITNESS:  Contradictory evidence

25         that I rely upon?

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                May 19, 2021

Page 151

1          Q.      (By Mr. Loegel) No.   I'm sorry.   Let me

2   rephrase the question, Mr. Foster.

3                  If there were evidence that you've not

4   seen, that indicates a different fact pattern than

5   what you've written in your report, would you like to

6   see it?

7                  MR. HARPER:   Object to the form.

8                  THE WITNESS:   I mean, if you have it.

9                  I -- I relied -- what I base my

10          evidence on, on the 13 list of things that

11          formulate my opinion, and what I received,

12          so --

13                  MR. HARPER:   Yes.   Object to the form.

14                  Mr. Loegel, that question cannot be

15          answered.   It calls for speculation.   Without

16          giving him any type of contradictory evidence,

17          there's no way for him to know just a general

18          proposition that something may contradict the

19          current evidence in the case.

20                  If you have something to show him, or a

21          hypothetical --

22                  MR. LOEGEL:   Mr. Harper, I appreciate

23          your soliloquy.

24                  MR. HARPER:   Well, I'm not trying to

25          give a speech here, sir, but I think the

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 152

1          question is unanswerable.

2                  MR. LOEGEL:  I appreciate that.

3                  THE WITNESS:  So once again --

4          Q.     (By Mr. Loegel) Go ahead, Mr. Foster,

5     please.

6          A.     I keep saying the same thing over and

7     over again: I relied on what I have in my report,

8     based on the stuff I received.

9          Q.     Okay.  And that's all -- okay.  Thank

10    you, Mr. Foster.

11                 Mr. Foster, if there was evidence that

12    Mr. May lunged at Officer Cook, before Officer Cook

13    deployed his TASER, would that change your opinion as

14    to whether or not Officer Cook used excessive force?

15         A.     Sir, based on the video that I looked

16    at and based on the report, that's what it -- that's

17    what formulated my opinion.

18                 So I don't know what you're getting at,

19    but . . .

20         Q.     Actually, Mr. Foster, you based your

21    opinion on the video and the reports that you were

22    provided; is that correct?

23         A.     And my experience.

24         Q.     And your experience.  Anything else?

25         A.     And my training.  My training.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 153

1      Q.      Anything else?

2      A.      That's it.

3      Q.      Okay.  Mr. Foster, I'm going to look at

4  another sentence in this report.  I'm still on

5  Page 6.  And it begins -- it's the last sentence of

6  the page.

7              It says, "The video shows five or six

8  officers in single file entering May's cell at the

9  same time.  This behavior by the officers is

10 indicative of excessive force."

11             Do you see that sentence?

12     A.      Yes.

13     Q.      You've had a chance to read that

14 sentence?

15     A.      Yes.

16     Q.      And you're comfortable with that

17 sentence?

18     A.      Yes.

19     Q.      Okay.  What evidence are you basing

20 that sentence upon?

21     A.      Based on the video that I observed.

22     Q.      Anything else?

23     A.      Also, the use of force of -- of

24 displaying a TASER.  There was more than one officer

25 that had their TASER ready to deploy.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                          May 19, 2021

Page 160

```
 1    now, but I had a list of the deployment -- TASER

 2    deployment of the TASER that Officer Cook, Jackson,

 3    Whitaker, used.

 4         Q.     Okay.

 5         A.     And --

 6         Q.     Mr. Foster, let me ask you a

 7    hypothetical question.  If the evidence from the Axon

 8    report indicated that one or more of these TASERs

 9    that you wrote in your report, did not make contact,

10    and did not conduct a circuit, would that change your

11    opinion as to whether or not the force used against

12    Mr. May was excessive?

13         A.     No.  That would not change my opinion.

14         Q.     Okay.  Mr. Foster, on Page 7, you

15    write, "Officer Cook stated in his report that while

16    in the cell, he gave May commands to get down on the

17    floor and May failed to comply.  Officer Cook then

18    discharged his TASER.

19                "His statement does not match the

20    sheriff's surveillance video's depiction of what took

21    place before his entry into the cell."

22                Do you see those sentences?

23         A.     Yes.

24         Q.     Okay.  What are you basing these

25    statements upon?  What evidence have you reviewed
```

Page 164

```
 1                    You may answer.

 2                    THE WITNESS:  No.  It would not change

 3          my opinion.

 4          Q.     (By Mr. Loegel) Okay.  Thank you.

 5                    Mr. Foster, the next full photograph,

 6   still on Page 8, begins, "My opinion that the use of

 7   X2 TASER was excessive use of force and the failed to

 8   use properly TASER practices, which can result" --

 9   "which can cause a potentially hazardous situation

10   which, if not avoided, could result in death or

11   serious injury."

12                    Do you see that?

13          A.     Yes.

14          Q.     Okay.  I guess I want to break this

15   into components.

16                    Your first opinion was that the use of

17   the X2 was excessive force; is that correct?

18          A.     Yes.

19          Q.     And your second opinion is that the

20   officers used -- failed to use proper TASER

21   practices; is that correct?

22          A.     That's correct.

23          Q.     Okay.  What are you basing your opinion

24   that the officers failed to use correct TASER

25   practices upon?
```

Page 165

1          A.    If you continue to read after it says

2    "death and serious injury," I said, "See TASER

3    handheld CEW warning, instructions and information,

4    law enforcement."

5          Q.    I see that.  Thank you.

6                Did you rely on anything else in making

7    that conclusion, besides TASER handheld CEW warnings,

8    instructions and information, law enforcement?

9          A.    I relied on my experience and my --

10   experience of investigating use of force of TASER,

11   and my experience of -- my training from the company

12   that made the X2, and training.

13         Q.    Okay.

14         A.    Training on -- TASER training.

15         Q.    Anything else?

16         A.    Use of force --

17         Q.    Okay.

18         A.    -- training.

19         Q.    Mr. Foster, are you a TASER-certified

20   trainer?

21         A.    No, I'm not.

22         Q.    Okay.  Mr. Foster, the last opinion in

23   that sentence begins with, "which can cause a

24   potential hazardous situation which, if not avoided,

25   could result in death or serious injury."

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 166

1              Do you see that?

2       A.    Yes.

3       Q.    Is that a direct quote from the TASER

4  handheld CEW warnings?

5       A.    Yes, it is.

6       Q.    Okay.  And you wrote, "can cause a

7  potentially hazardous situation."  What potentially

8  hazardous situation are you referring to here?

9       A.    The hazardous situation -- you cannot

10  TASE -- according to Axon, you cannot TASE someone

11  who's standing in a pool of water; you cannot TASE

12  someone who's standing on a ledge; who's -- who's

13  blind, or pregnant.  These are hazardous-situation

14  rules that you cannot deploy a TASER.

15              Someone who has a -- a heart condition,

16  you shouldn't use a TASER on them.  Someone who's

17  blind, you shouldn't use a TASER on them on.  Someone

18  who could fall on a hard floor, such as a concrete

19  floor, can cause a hazardous situation.

20              So it depend on where they're going to

21  fall.  They could hit their head on metal; they could

22  hit their head on a table, or glass, or -- you can't

23  TASE somebody.  So you have to be . . .

24       Q.    Mr. Foster, is it your opinion that

25  Mr. May was blind?

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 167

1          A.    I don't know what his eyesight was,
2    sir.
3          Q.    Is it your opinion --
4          A.    I don't have an opinion on that.
5          Q.    Do you have an opinion on whether he
6    had a heart condition?
7          A.    I have no opinion on his medical
8    conditions.
9          Q.    Do you have any -- do you have an
10   opinion on whether or not he was standing in water?
11         A.    I don't know --
12         Q.    Do you have an opinion whether he was
13   standing on a ledge?
14         A.    No.  I don't think he was standing on a
15   ledge.
16         Q.    Okay.  Moving on to the next sentence,
17   if you'll read with me, "The Fulton County Sheriff's
18   Office use of force report indicate approximate TASER
19   locations of the chest, left thigh, and stomach.
20               Do you see that?
21         A.    Where you at?  On page --
22         Q.    The middle of Page 8, right below where
23   we've been discussing -- right below the sentence --
24         A.    "Indicate" -- okay, yeah -- "location
25   of" -- right.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 176

 1              Yes.

 2        Q.      And is that your opinion? -- that the
 3    restraint chair was effectively used for what it was
 4    intended to be used for?

 5        A.      What I meant by that is it was used --
 6    to use a restraint chair is to restrain someone, and
 7    they didn't use it properly.

 8              So that's what I meant by that.  It's
 9    used -- it could be used effectively, if you properly
10    use it.

11        Q.      I'm confused by that statement,
12    Mr. Foster.  But let's -- let me try to clarify it.

13              Is it your opinion that the officers
14    effectively used the restraint chair?

15        A.      No.  It's not my opinion that they
16    effectively use it, no.

17        Q.      Right.  Is it your opinion that the
18    officers used it for what it was intended to be used
19    for?

20        A.      No.

21        Q.      So your opinion is the opposite of what
22    this sentence reads.  Is that accurate?

23        A.      Yeah.  I didn't word it properly --
24    what I intended to word it.  What I intended to use
25    that sentence is, if you use the -- I should have

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 177

 1    reword it.

 2              If you use the restraints chair

 3    properly, that's what the intent of it.  They didn't

 4    use the intent of the chair.

 5              You understand what I'm getting at?

 6        Q.    **Mr. Foster, I'm sorry.**

 7        A.    Let me explain it a little better.

 8              They didn't use -- what I meant by that

 9    sentence -- and I should have reworded it.  I worded

10    it poorly.

11              What I meant by, if they would have

12    used the chair what it intended -- how it should be

13    used, then it would have been effective.

14              It was not effective the way they used

15    the chair.  It was inappropriate the way they used

16    the chair.

17        **Q.    Okay.  So your opinion --**

18        A.    So my opinion is --

19        **Q.    You're telling me what your opinion is**

20    **now; is that correct?**

21        A.    I didn't hear what you said.

22              MR. HARPER:  Object to the form.  It

23           misstates testimony.

24              MR. LOEGEL:  Yes.  I'm trying to state

25           testimony.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 188

```
 1   of here?

 2           THE WITNESS:  Yeah.  I'm good.

 3           MR. LOEGEL:  Mr. Court Reporter, let's

 4   go off the record.

 5           (Thereupon an off-the-record discussion

 6   was had and a short recess was taken, after

 7   which the following proceedings were had:)

 8           MR. LOEGEL:  Back on the record.

 9           Mr. Foster, I have no further questions

10   for you.  Thank you.

11           I understand that you're going to

12   provide me with Exhibits No. 11 and 12 from

13   your report; as well as any additional TASER

14   warnings that you reviewed; as well as any

15   evidence or material relating to the juvenile

16   case, which is responsive to Rule 26; any

17   restraint chair material that you relied upon;

18   and any material from the deescalation class

19   that you published.

20           Is that a fair assessment of the

21   material that you were going to provide?

22           THE WITNESS:  Yes.

23           You want the deescalation class?

24           MR. LOEGEL:  Yes, sir.  I'd like all

25   the -- whatever material you created in
```

Page 189

1    furtherance of that presentation.

2            THE WITNESS:  You're talking about that

3    legal class for police/subject threat

4    assessment?

5            MR. LOEGEL:  Yes, sir.

6            THE WITNESS:  Okay.  That's what you

7    want.  All right.

8            MR. HARPER:  And, Mr. Loegel, based on

9    the restraint chair information you're looking

10   for, he did discuss where he got the restraint

11   chair information from.

12           Was there something else?

13           MR. LOEGEL:  He mentioned that there

14   was some material that he printed out, or --

15           Is that correct, Mr. Foster?

16           THE WITNESS:  For the restraint chair?

17           MR. LOEGEL:  Yes, sir.

18           THE WITNESS:  No.  I said I -- I have

19   my certificate of training.  That's a -- a

20   certificate certifying.

21           MR. LOEGEL:  My mistake.  In that case,

22   then, the only material I really want is that

23   certificate.

24           THE WITNESS:  Okay.  The certificate,

25   and the TASER.

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 195

```
 1                    A detention center.  I would say more

 2     detention.

 3            Q.     And what were your responsibilities?

 4                   What was your job title, first, when

 5     you first --

 6                    MR. LOEGEL:  I'm sorry, Mr. Harper.  I

 7            only ask the question -- could you please read

 8            the time right now?

 9                    Is it 3:45?

10                    MR. HARPER:  Yes.

11                    MR. LOEGEL:  Okay.  Thank you,

12            Mr. Harper.  That's all I have.

13            Q.     (By Mr. Harper) All right.  Go ahead,

14     Mr. Foster.  What was your job title?

15            A.     I was a supervisor over the U.S.

16     Marshal cellblock in D.C. Superior Court.  And that

17     job entailed supervising the deputies, marshals who

18     worked in the cellblock, detention officers, and

19     guards that we hired to . . .

20                    And I was responsible of transporting

21     inmates from the cellblock to the -- back to the

22     jail, receiving inmates from the jail, or from police

23     officers off the street; feeding them; make sure they

24     had the proper medical attention, if we had a medical

25     situation.
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 196

1                    If we had a medical emergency, make

2     sure that they were transported to the -- seen by the

3     nurse, or fire medics, and transported to the proper

4     medical facility, and provide guard service while

5     they're there and get them processed back; processing

6     and receiving, transportation to different

7     jurisdictions throughout the state of Maryland or

8     Virginia.

9          Q.     **Before you were a supervisor, what was**

10    **your job title?**

11         A.     I was a Deputy U.S. Marshal.  The next

12    above that is supervisor.

13                    And I -- as a deputy, I transported

14    prisoners; I arrest -- make arrests on the streets

15    for fugitive arrests, protection of the courts,

16    and -- and seizing of property.

17         Q.     **When you worked in the correctional**

18    **setting, did those inmates receive a medical**

19    **screening before they were placed in a cell at that**

20    **location?**

21         A.     Yes.  We asked them -- we reviewed

22    their medical records.  They came with medical

23    records, and the deputy was responsible to review the

24    medical information.  And it -- they couldn't come

25    into our cell unless it was medically cleared by a

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 197

1    doctor.

2                If they was injured by the police, or

3    they came from the jail, they had to be medical

4    cleared, and it was my deputies' responsibility to

5    review that.  If we had someone who was needing of

6    medical assistance, we got them the medical

7    assistance.

8         Q.    Okay.  So is it your testimony, based

9    on your experience, that the officers were required

10   to review the medical information of the inmates

11   before they were placed into a cell?

12        A.    Yes.  They were required to -- not --

13   they wouldn't even be accepted into our cell --

14   detention area on cellblock.  Unless they was

15   medically cleared, we wouldn't even put them in a

16   cell.

17                If we had to put them in a cell, we got

18   them medical attention immediately, before we did any

19   processing.

20        Q.    And based on your experience, if an

21   inmate had tested positive for amphetamines, or

22   drugs, would that inmate have been placed in a

23   holding cell, or would they have received some type

24   of medical treatment?

25        A.    They would have been placed in a

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 199

1    your definition and understanding -- I'm sorry,

2    excessive force.

3              What is excessive force, based on your

4    understanding and experience?

5         A.    Excessive force is force that a

6    reasonable officer would not use to gain control or

7    compliance of the subject.

8              In other words, force beyond, that's

9    not reasonable, so that's -- you know, objectively

10   reasonable.

11        Q.    Did you finish?

12        A.    Yes.

13        Q.    Okay.  That's fine.

14              When you worked in the jail setting,

15   did you guys wear body cameras?

16        A.    No, we didn't.  Because we had cameras

17   in every cell and outside the cell.

18        Q.    So there was no need for the officers

19   to wear body cameras, because the entire jail was

20   under surveillance?

21        A.    Yes.

22        Q.    Okay.  Even inside the holding cell?

23        A.    Yes.  Every holding cell had a camera,

24   and every -- outside and inside the cell.

25        Q.    Okay.  So --

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                      May 19, 2021

Page 204

 1          Q.      Were you able to see, based on the

 2     TASER logs, how many seconds passed from when

 3     Mr. Cook opened that door to when he deployed the

 4     TASER?

 5          A.      It was, like, within a second or two.

 6     It was very . . .

 7          Q.      Right.  So based on that evidence,

 8     would it make sense to you that Mr. May was any type

 9     of threat to Mr. Cook?

10          A.      No.  It don't make sense to me.

11          Q.      I mean, even if Mr. May was in the cell

12     standing there nude, based on the objective,

13     reasonable standard, what threat, based on your

14     experience and understanding of the law, would

15     Mr. May have posed by standing at that door nude when

16     Mr. Cook opened the door?

17          A.      My opinion, none at all.

18          Q.      So it was --

19          A.      He has no weapon in his possession, and

20     he's not -- he's not hiding anything, so -- I mean,

21     you have six officers there.  So one person -- and

22     his size versus the officer, it doesn't pose a

23     threat.  He's not, you know, 6'7" and 350 pounds full

24     of muscle.

25          Q.      So would you agree that that action

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 213

```
 1   especially after the amount of force that they used

 2   on him.

 3              He should have went straight to

 4   medical; not stop and do a video.  They could have --

 5   they could have done that while he's been in medical,

 6   treating.  That's precious time to waste.

 7        Q.    Do you recall seeing anything on a

 8   Lieutenant Derrick Paige?

 9              When you looked the disciplinary files,

10   do you recall seeing a Lieutenant Paige?

11              A supervisor.

12        A.    Yeah, the supervisor, I recall reading

13   that report.  But if you're getting to something

14   specific . . .

15        Q.    Okay.  Do you recall seeing in the

16   report of supervisor, Lieutenant Paige -- do you

17   recall the fact that he was also written up regarding

18   the excessive restraints?

19        A.    Yes.

20        Q.    All right.

21        A.    I recall that.

22        Q.    Would you say that, as a supervisor, if

23   Mr. Paige saw the restraints -- the additional

24   restraints on Mr. May, would he have had a

25   responsibility to have them removed immediately?
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

Page 214

1          A.    Yes.  He has a standard of care of the
2     inmate.  Yes.
3          Q.    So would you say that Lieutenant
4     Paige's decision to not remove those restraints,
5     means that he also constituted excessive force, based
6     on your experience and training?
7          A.    Yes.  I would say that.
8          Q.    You wrote your opinion based on the
9     officers that are listed in your report.  Are you
10    aware that there are other officers who have been
11    sued in this case, based on the Antonio May incident?
12         A.    I don't -- I'm not -- I don't recall.
13         Q.    Okay.  That's fine.
14         A.    I really don't recall.
15         Q.    All right.  Let me just let me know,
16    then.  For the sake of this question, assume that
17    there were 13 officers total that are defendants in
18    this case.
19                Do you follow me?
20         A.    I follow you.
21         Q.    Are you aware of any training or law
22    that says that officers who observe excessive force
23    and do not intervene, are also guilty, or responsible
24    for the inmate, based on excessive force?
25         A.    Yes.  Yes, I'm aware of that.  They

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                May 19, 2021

Page 215

 1    have a duty to react.

 2         **Q.    Tell us about your training and**

 3    **experience as to what officers who witness excessive**

 4    **force -- can you expound?**

 5              **What should those officers do exactly**

 6    **when they see other officers committing excessive**

 7    **force?**

 8         A.    Well, they have a duty to react.

 9    Because they'll be in compliance -- they'll be

10    explicit in allowing that to happen, in their

11    presence.  So if they don't, they could be

12    disciplined, or be treated just as the officers that

13    used the excessive force.

14              So -- and especially a supervisor.

15    That's failure to supervise -- that's a failure of

16    supervise.  So they have to intervene and stop the

17    officers have violating their policy.

18         **Q.    Okay.**

19              MR. HARPER:  I think that's it for me.

20    I have no further questions.

21              Mr. Reese, do you have any?

22              MR. REESE:  Yes.

23

24

25

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                    May 19, 2021

```
 1                        EXAMINATION
 2    BY MR. REESE:
 3         Q.      How you doing today, Mr. Foster.
 4         A.      I'm hanging in there.
 5         Q.      Thank you so much, sir, for your time.
 6    I know it's a long time, and I'm going to be
 7    extremely short here.  We appreciate your services
 8    today.
 9              Just to make sure that I'm absolutely
10    clear, is there anything that you have heard, that
11    you have been questioned about, or anything that has
12    been presented today, that changes, or causes you to
13    question your underlying opinion in the report that
14    you have submitted in this case?
15         A.      Nothing I heard that would change my
16    opinion at this time.
17              MR. REESE:  Thank you, sir.  I have no
18         further questions.
19
20                    FURTHER EXAMINATION
21    BY MR. LOEGEL:
22         Q.      Just a few followups.
23              Mr. Foster, does your report offer any
24    opinions about camera usage?
25         A.      No, it doesn't.
```

The Estate of Antonio Devon May, et al. vs Fulton County, Georgia, et al.
Randy Foster                                                  May 19, 2021

Page 217

1        Q.      Does your report offer any opinions
2    about video interpretation?
3        A.      No, it doesn't.
4        Q.      Does your report offer any opinions
5    about Lieutenant Paige?
6        A.      No, it doesn't.
7        Q.      Does your report offer any opinions
8    about supervisory liability?
9        A.      No, it does not.
10        Q.      And you mentioned that Lieutenant Paige
11    violated a standard of care.  What standard of care
12    did Lieutenant Paige allegedly violate?
13        A.      Well, an officer -- once you have a
14    prisoner in custody, you're responsible for their
15    health and safety, and to make sure that they're not
16    injured, or they don't injure theirself, or injure
17    somebody else.
18               That's the standard of care that I'm
19    talking about.
20        Q.      And can you point --
21        A.      So if they cannot care for theirself,
22    they're in your custody, you have to care for them.
23        Q.      Can you point me to where that standard
24    of care is written down, as you've just reported it?
25        A.      Well, you can look -- like, the

Page 218

1  national prisoners standard -- I have to look at up

2  for you.  I can't remember the acronym.

3            But there's a -- association of -- I

4  think you named one of the association today.  I

5  can't recall it.  The national standard of --

6  national prison standards.

7       Q.    Did you mention any standards, or this

8  national prison standard, in your report?

9       A.    No.  I did not mention it.

10      Q.    Did you produce it in response to our

11 subpoena for documents?

12      A.    No.  I can try to bring it up, yes.

13      Q.    No, no.  My question is, did you

14 produce it.

15      A.    Oh, did I produce it?  No, I did not.

16      Q.    Did you identify it in your report?

17      A.    No, I did not.

18      Q.    Does your report offer any opinions

19 about the duty that an officer may have, regarding an

20 observed use of force?

21      A.    No.  My report doesn't offer that.

22            MR. LOEGEL:  I have no further

23       questions.  Thank you for your time.

24            THE WITNESS:  Thank you.

25            MR. WALLACE:  I have one followup.