IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

THE ESTATE OF ANTONIO DEVON
MAY, by and through his
Administrator, APRIL M. MYRICK, et
al.,

      Plaintiffs,

      v.

NAPHCARE, INC., et al.,

      Defendants.

CIVIL ACTION FILE
NO. 1:19-CV-2440-TWT

## OPINION AND ORDER

This is a civil rights case. It is before the Court on the Officer Defendants' Motion for Summary Judgment [Doc. 209], the Naphcare Defendants' Motion for Summary Judgement [Doc. 213], and the Plaintiff's Motion for the Court to Take Judicial Notice of Adjudicative Facts [Doc. 235]. For the reasons set forth below, the Officer Defendants' Motion for Summary Judgment [Doc. 209] is GRANTED, the Naphcare Defendants' Motion for Summary Judgement [Doc. 213] is GRANTED, and the Plaintiff's Motion for the Court to Take Judicial Notice of Adjudicative Facts [Doc. 235] is GRANTED.

## I.    Background

This case arises out of a tragedy. On September 11, 2018, Antonio May died at the Fulton County Jail. (Officer Defs.' Statement of Undisputed Facts

¶¶ 1–2, 136.) The Plaintiffs allege that May was killed during an altercation between him and numerous Fulton County detention officers who were attempting to subdue him. (Second Am. Compl. ¶¶ 40–47.) In this altercation, the Plaintiffs allege that the Officer Defendants used tasers, pepper spray, and excessive restraints against May that caused excited delirium and a sudden cardiovascular collapse. (*Id.* ¶ 48.) Following his death, May's Estate and the legal guardians of May's minor children, April Myrick and Sheena Pettigrew, brought several claims before this Court, two of which remain pending after an earlier Motion to Dismiss was granted. (Aug. 13, 2020 Order, at 34.) First, the Plaintiffs sued the Officer Defendants under 42 U.S.C. § 1983, alleging the Officers employed excessive force and demonstrated deliberate indifference towards May in violation of his constitutional rights. (Second Am. Compl., Count I). Second, the Plaintiffs sued Naphcare, Inc. ("Naphcare") and one of its paramedics, Travis Williams (collectively, "the Naphcare Defendants"), with medical negligence. (*Id.*, Count V.) The Officer Defendants and the Naphcare Defendants now seek summary judgment on the claims asserted against them.

## II.   Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and draw any inferences in the light most favorable to the nonmovant. *Adickes v. S.H. Kress*

& *Co.*, 398 U.S. 144, 158–59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## III.   Discussion

Before addressing the merits of the Motions before the Court, the Court must address the Defendants' Statements of Undisputed Material Facts and the Plaintiffs' responses. Under this Court's Local Rules, movants "for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried." N.D. Ga. Local R. 56.1(B)(1). Respondents may respond to these proposed facts with "individually numbered, concise, nonargumentative responses . . . ." N.D. Ga. Local R. 56.1(B)(2)(a)(1). After reviewing the putative facts and the corresponding responses:

> This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1).

N.D. Ga. Local R. 56.1(B)(2)(a)(2). Both the Officer Defendants and the

3

Naphcare Defendants filed Statements of Undisputed Material Facts, and the Plaintiffs responded to each. However, the Plaintiffs repeat several deficient responses to the Defendants' alleged facts. For example, the Plaintiffs respond to many of the Officer Defendants' proposed facts by noting that no body camera footage proves those facts. (*See* Pls.' Responses to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 15, 18, 20, 42, 55, 76, 83, 87–90, 111, 112, 116, 118–19.) Because these responses misunderstand the Parties' respective burdens and do not cite specific evidence, these responses are deficient under Local Rule 56.1(B)(2)(a)(2), and the Defendants' facts are deemed admitted. A similar deficiency is found in the Plaintiffs' response to the Naphcare Defendants' Statement of Undisputed Material Facts, and those facts are also deemed admitted. (*See* Pls.' Responses to Naphcare Defs.' Statement of Undisputed Material Facts in Supp. of Naphcare Defs.' Mot. for Summ. J. ¶¶ 13–14.)

In addition, the Plaintiffs' responses to many of the Defendants' alleged facts are insufficiently specific. For example, in response to 32 of the Officer Defendants' proposed facts, the Plaintiffs merely claim: "Refuted by the officer statements. (Incident Report attached as Exhibit 6 pp. 2–15.)" However, the Local Rules require specificity in the respondent's responses to promote efficiency and to limit the Court from having to infer how and why the respondent was to contest the proposed fact. *See* N.D. Ga. Local R. 56.1(B)(2)(a)(2) (noting that the respondent's responses must be "supported by

4

specific citations to evidence (including page or paragraph number)"). This repeated reference to 13 pages of documents is not specific enough to rebut the Defendants' facts, and where the Plaintiffs respond in this manner, those facts are deemed admitted. The same lack of specificity plagues the Plaintiffs' references to the Jail's security footage. For ten of the Defendants' alleged facts, the Plaintiffs merely cite the same timestamp on one of the Jail's security footage videos, labeled "New Intake Door 115." (Pls.' Response to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J., ¶¶ 23–26, 29–33, 48.) Beyond the citations' lack of specificity, the video provides insufficient evidence to rebut many of the proposed facts based on the Officers' testimony as to the events that occurred within May's cell. First, the image quality is poor, and the camera angle precludes any view into May's cell. Second, the video has no sound, and thus cannot be used to dispute what was said between the Officers and May. The video can be used to assess the number of officers in the cell at a given time and the time and manner of May's removal from the cell. However, without evidence to rebut the Defendants' properly proposed facts of the events within the cell, the Plaintiffs' responses fail, and these facts are deemed admitted.

The Defendants are guilty of their own procedural deficiencies: they often cite pleadings in support of their proposed facts. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 1–3, 5, 136.) Beyond these issues, the Plaintiffs raise many procedurally proper

objections to the Defendants' proposed facts. Where the Court agrees with their assessments, those disputed material facts will be resolved in favor of the non-moving party, the Plaintiffs. With this is mind, the Court bases this Order on the following facts.

### A. Admitted Factual Background

According to an APD Incident Report, May was arrested by APD on the morning September 11, 2018, after he was found throwing rocks at the American Cancer Society building in Downtown Atlanta. (Pls.' Br. in Opp'n to Officer Defs.' Mot. for Summ. J., Ex. 1, at 3.) After being admitted to the Jail, May underwent a medical examination, which indicated methamphetamine, amphetamine, and ecstasy were in his system. (Officer Defs.' Statement of Undisputed Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 4, 6.) This medical assessment was conducted by the Defendant Travis Williams, a Naphcare paramedic. (Pl.'s Statement of Additional Material Facts in Opp'n to Naphcare Defs.' Mot. for Summ. J. ¶ 7.) Williams noted that May had indicated he was suicidal. (*Id.* ¶ 8.) While in the Jail's intake area, May became disruptive and was placed into a holding cell immediately adjacent to the intake area around 9:00 a.m. (*Id.* ¶¶ 19–20, 23.)

At approximately 3:30 p.m., members of the Direct Action Response Team ("DART") arrived to the intake area as part of a routine patrol. (Officer Defs.' Statement of Undisputed Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 8, 14.) DART personnel are not assigned to any particular facility but

generally assist with activities such as patrols and incident responses. (*Id.* ¶ 8.) Sgt. Jamillah Saadiq, who was overseeing the intake area at the time of this patrol, observed that May was naked in his cell. (*Id.* ¶¶ 13, 15.) Being naked in the holding cell is a violation of jail policy, and inmates must be dressed to complete the intake process. (*Id.* ¶¶ 16–17.) Sgt. Saadiq requested that May dress himself, and May did not comply. (*Id.* ¶ 20.) Sgt. Saadiq then spoke with Officer Aaron Cook[1] seeking assistance in getting May dressed. (*Id.* ¶ 21.) Officer Cook, along with Officers Omar Jackson and Jamel Goodwine, approached the cell and observed May naked in the cell. (*Id.* ¶ 22.) Officer Cook gave May verbal commands to get dressed, and May refused. (*Id.* ¶¶ 23–24.) Officer Cook then asked May to move back from the cell door and for the door to be opened. (*Id.* ¶ 25.) As the door opened, Officer Cook withdrew his taser, and he believed that May took an aggressive stance. (*Id.* ¶¶ 29–30.) As Officer Cook instructed May to get on the ground, May continued to refuse and took a step towards Officer Cook. (*Id.* ¶¶ 29, 31–32.) At this time, all three Officers present felt May represented a threat to them. (*Id.* ¶ 33.) Officer Cook then deployed his taser, striking May in the back. (*Id.* ¶¶ 34–35.)[2] The log of Officer

---

[1] Officer Cook's first name is spelled differently across the filings in this case. The Court will proceed with the spelling that appears most often and regrets any error.

[2] The Plaintiffs' response to the Defendants' alleged fact here is not responsive to the specific fact alleged, and thus this fact is deemed admitted. Many of the Plaintiffs' responses to the Defendants' facts regarding the Officers' use of tasers do not respond to the specific fact alleged, and these facts are therefore admitted. (*See* Pls.' Response to Officer Defs.' Statement of

Cook's taser indicated this deployment potentially affected May for no more than two seconds. (*Id.* ¶ 37.) After being struck with the taser, May fell back but then got back up and punched towards Officer Cook. (*Id.* ¶¶ 38–39.) Officer Cook attempted to deploy another charge through the taser, but this attempt did not affect May. (*Id.* ¶ 40.)

At this point, other Officers took action to restrain May. May was kicking his legs, and Officer Jackson attempted to restrain his legs. (*Id.* ¶¶ 42–43.) To help him restrain May, Officer Jackson executed a drive stun with his taser on May. (*Id.* ¶¶ 46–47.)[3] Officer Whitaker observed May kicking at Officers and believed May presented an immediate threat to the safety of the Officers. (*Id.* ¶¶ 49, 52.) Officer Whitaker deployed his taser, but the deployment appeared to have no effect. (*Id.* ¶¶ 54–56.) Officer Whitaker then twice attempted to use his taser to drive stun May, which could have been potentially effective. (*Id.* ¶¶ 60–62.) Officer Whitaker, however, believed these efforts were ineffective, and he sprayed May's face with pepper spray. (*Id.* ¶¶ 63, 66.) Officer Jason Roache then took May to the ground using a tactical

---

Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 34, 36–37, 40, 54, 56, 59, 61.) The same is true for a variety of alleged facts regarding which Officers placed May into a transport chair and Lt. Paige's arrival to the scene, and these facts are admitted, as well. (*Id.* ¶¶ 98–99, 125.)

[3] Despite the Plaintiffs' response, the Defendants' citations support the claims that Officer Jackson utilized his taser with a drive stun maneuver on May, and that May was kicking his legs at the time. These facts are deemed admitted, as are others that similarly fail to identify conflicting testimony or evidence. (Pl.'s Response to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 22, 46–47, 66, 70, 101.)

maneuver and was able to place leg irons on May with the assistance of Officers Cook, Jackson, and Goodwine. (*Id.* ¶¶ 71–73.) Officer Kenesia Strowder [4] attempted to handcuff May, though his level of resistance is disputed. (*Id.* ¶¶ 78–79; Pls.' Response to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 79.) In the process of handcuffing May, Officer Strowder struck May with a closed fist four times in the face, arm, hand, and back. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 80.) Ultimately, Officer Jermaine Copeland applied handcuffs to May. (*Id.* ¶ 86.) These handcuffs were immediately transferred to waist chains as May continued to kick his legs. (*Id.* ¶ 87.) Officer Guito Delacruz saw May spit and put a spit mask over his face. (*Id.* ¶¶ 92–93.)

Once restrained, Officers Cook, Jackson, Whitaker, and Roache placed May into a transport chair and moved him to the showers for decontamination following the deployment of pepper spray. (*Id.* ¶¶ 94, 96.) Officers Copeland, Goodwine, and Delacruz never touched the transport chair. (*Id.* ¶¶ 97–99.) May was decontaminated with cold water from a hose. (*Id.* ¶ 111.) After the decontamination, the Officers attempted to dress May as he continued to struggle and kick. (*Id.* ¶¶ 115–16.) As they attempted to dress May, Officers

---

[4] Like Officer Cook, Officer Strowder's name is spelled multiple different ways throughout the filings. The Court proceeds with the most used spelling and regrets any error.

9

Whitaker and Roache both punched May's legs one time to force compliance with the process of getting dressed. (*Id.* ¶¶ 118–19.) After his pants were put on, May was wheeled into the property room by Officer Whitaker where he could be examined by medical staff. (*Id.* ¶ 121.)

At this point, May and the Officers are plainly in view of the Jail security camera footage labelled "INMATES DRESS IN," and the following facts align with the footage. Officer Cook left the room to inform medical staff of May's location and request a medical evaluation. (*Id.* ¶ 122.) Approximately ninety seconds later, Officer Cook and a physician's assistant with Naphcare, David Didier, arrived in the property room. (*Id.* ¶ 123–24; Naphcare Defs.' Statement of Undisputed Facts in Supp. of Naphcare Defs.' Mot. for Summ. J. ¶¶ 17–18.) Didier visually evaluated May, who was continuing to breathe and move. (*Id.* ¶ 19.) During this examination, Lt. Derrick Paige entered the property room. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 125.) Approximately a minute later, Didier leaves the area to gather equipment. (Naphcare Defs.' Statement of Undisputed Facts in Supp. of Naphcare Defs.' Mot. for Summ. J. ¶ 20.) It is undisputed that at some point while Didier was away from the property room, May stopped moving. (*Id.*)

Given the factual disputes between the Parties and the clarity with which the following events are depicted, the Court will now summarize these events as depicted by the footage. Approximately fifteen seconds after Didier

leaves the property room, Officer Whitaker pulls May's spit mask up so his face is exposed. ("Inmates Dress In" Video at 4:11:08pm.) May's legs move at this time, his knees coming together. (*Id.*) Approximately ten seconds later, Officer Whitaker lifts the front end of the chair, lowering May's body back. (*Id.* at 4:11:23pm.) Officer Whitaker rocks the chair up and down slightly, and May does not move in response. (*Id.* at 4:11:25pm.) After ten seconds, Officer Whitaker drops the chair back to resting position, jolting May but not causing any reaction. (*Id.* at 4:11:33pm.) Officer Whitaker then begins to push May's head, and an Officer standing next to him begins to look at May and touch his chest. (*Id.* at 4:11:44pm.) May does not respond to these touches. After fifteen more seconds, another officer approaches May, and the Officers begin to remove May's restraints. (*Id.* at 4:11:57–4:12:12pm.) The Officers take approximately two minutes to get May out of his restraints and onto the floor, during which time an Officer shines a flashlight in May's face and he is seen laying limp in his chair. (*Id.* at 4:12:12–4:14:23pm.) As May is being lowered to the floor, medical staff returns to the property room. (*Id.* at 4:14:12pm.) Officers and medical staff surround May and attempt to resuscitate him. (*Id.* at 4:14:23pm) For the next 27 minutes, a rotating group of Officers, medical staff, and Atlanta Fire Department personnel attempted to resuscitate May. (*Id.* at 4:14:23–4:41:37pm.) Tragically, May died on the floor of the property room. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 136.) The Fulton County Medical Examiner

11

concluded from May's autopsy that he "died as a result of sudden cardiovascular collapse from probable excited delirium with physical restraint use, while under the influence of methamphetamine." (Naphcare Defs.' Statement of Undisputed Material Facts in Supp. of Naphcare Defs.' Mot. for Summ. J. ¶ 22.)

Following the incident, the Fulton County Sheriff's Office of Professional Services conducted an investigation. Officers Cook, Jackson, Whitaker, Roache, Delacruz, and Paige received a written warning for failure to conform to directives by improperly applying the restraint chair's wrist restraints and failing to remove the waist chain and leg irons in a timely manner. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 137.) The Fulton County Sheriff's Use of Force Review Board investigated the incident and found that none of the officers used excessive force. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 139.)

On November 16, 2021, the Officer Defendants were indicted by a Fulton County grand jury for a variety of charges related to May's death: felony murder (O.C.G.A. § 16-5-1); aggravated assault (O.C.G.A. § 16-5-21); battery (O.C.G.A. § 16-5-23.1); and two counts of violation of oath by public officer (O.C.G.A. § 16-10-1). (*See* Pls.' Mot. for Judicial Notice, Ex. 1, at 1.) The Plaintiffs' Motion for this Court to take judicial notice of the existence of this

12

indictment is granted.⁵ *See* Fed. R. Evid. 201(b)(2), (c)(2); *see also United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (noting that a court may take judicial notice of filings in another court not for the truth of the material therein but rather the existence of that litigation and its subject matter).

## B.  The Officer Defendants' Motion for Summary Judgment

In response to the Plaintiffs' excessive force and deliberate indifference claims, the Officer Defendants argue that they are entitled to qualified immunity. They argue that their actions with regards to May were neither unreasonable under the circumstances nor violative of any clearly established constitutional right. (Officer Defs.' Br. in Supp. of Officer Defs.' Mot. for Summ. J., at 8, 28–32.) "Because § 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation," the actions of each Officer Defendant are detailed to demonstrate their alleged reasonableness. (*Id.* at 8–28;) *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (internal quotation marks omitted). With regards to the Plaintiffs' deliberate indifference claim, the Officer Defendants

---

⁵ The Defendants express concern that judicial notice of this indictment will "improperly expand on the summary judgment briefing" and that the Plaintiffs are attempting to "offer the indictments as a 'backdoor' attempt to prove the thrust of the charges brought against the Defendants." (Officer Defs.' Br. in Opp'n to Pls.' Mot. for Judicial Notice, at 1–2, 3.) However, Federal Rule of Evidence 201(c)(2) requires this Court to take judicial notice of appropriate facts when a party requests it and the relevant documents are provided. As such, the Plaintiffs' Motion is granted. Alternative methods, such as jury instructions, exist as means for handling the Officer Defendants' concerns on this issue.

argue that they lacked awareness of any of May's medical status and thus were not indifferent to any potential serious medical need. (Officer Defs.' Br. in Supp. of Officer Defs.' Mot. for Summ. J., at 33.) In response, the Plaintiffs first argue that "a jury is needed in this case to determine the credibility of the officers' statements[.]" (Pls.' Br. in Opp'n to Officer Defs.' Mot. for Summ. J., at 7.) Moving to the facts of the case, the Plaintiffs then argue that the Officers' use of tasers, closed fist strikes, pepper spray, a spit hood, and a restraint chair were objectively unreasonable under the circumstances. (*Id.* at 9–29.) Further, the Plaintiffs argue that the Officer Defendants witnessed May lose consciousness and failed to offer medical assistance in a deliberately indifferent manner. (*Id.* at 32.)

The Plaintiffs' excessive force and deliberate indifference claims "are both subject to the doctrine of qualified immunity, which bars many damages actions against government officials." *Patel v. Lanier Cty., Ga.*, 969 F.3d 1173, 1181 (11th Cir. 2020). "Officers who act within their discretionary authority are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020) (internal quotation marks omitted). It is undisputed that the Officer Defendants were acting within their discretionary authority, so the burden shifts to the Plaintiffs to demonstrate that the Defendants violated a constitutional right of May's that was clearly established

14

as of September 11, 2018. *Patel*, 969 F.3d at 1181. The Court begins by evaluating the Plaintiffs' excessive force claim before moving to their deliberate indifference claim.

### i.  Excessive Force

Excessive force claims by pretrial detainees are governed under the Fourteenth Amendment's "objective reasonableness" standard. *Id.* (citing *Kinglsey v. Hendrickson*, 576 U.S. 389, 396–97 (2015)).

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at 397. "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* Further:

> A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

*Id.* (internal punctuation and quotation marks omitted).

Given this standard and the undisputed facts here, viewed in the light most favorable to the Plaintiffs, the Officer Defendants did not subject May to objectively unreasonable force. As the interaction between May and the

Officers began, May was in violation of the Jail's policy such that Officers had to intervene. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 17, 19.) May refused to put on his clothes and ignored instructions to get on the ground as Officer Cook entered his cell, and in fact stepped towards Officer Cook. (*Id.* ¶¶ 23–24, 31–32.) Once May stepped towards him, Officer Cook deployed his taser. (*Id.* ¶ 32.) Under the *Kingsley* factors, the use of a taser against noncompliant pretrial detainee who steps towards an officer entering a cell despite verbal instructions to the contrary cannot be deemed objectively unreasonable. First, the use of a taser represents a reasonable amount of force given the Officers' need to obtain May's compliance with their directives. *See Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) (noting the Eleventh Circuit's precedent that "the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force"). Second, May's continued resistance after the taser deployment would indicate his injuries were not severe or incapacitating, and this factor leans in favor of Officer Cook's reasonableness. Third, Officer Cook's repeated instructions represent efforts to limit the amount of force used. *Cf. Wheat v. Day*, 859 F. App'x 885, 886–87 (11th Cir. 2021) ("[The Officer] apparently made no effort to temper the amount of force used. He gave no instructions or orders.") Finally, May was actively resisting commands and all three Officers present at this time felt May presented a threat. The Plaintiff has not

16

presented facts that show a genuine issue of material fact undermining Officer Cook's objective reasonableness. The *Kingsley* factors indicate that Officer Cook's initial use of his taser was not objectively unreasonable.

Beyond May's noncompliance with Officer Cook's verbal commands, the crucial fact underlying this analysis is May's step toward the Officers as Officer Cook entered his cell. This step, when considered in conjunction with May's refusal to comply with Officer Cook's demands, indicates that a reasonable officer under the same circumstances could have determined that May represented a safety or flight risk. The Plaintiffs failed to properly contest this fact in responding to the Defendants' Statement of Undisputed Material Facts, relying solely on video evidence that does not depict the events inside the cell. (Pls.' Response to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 32.) Reading the Plaintiffs' response liberally, it appears the Plaintiffs responded to the Defendants' allegation that May stepped towards the Officers in a different paragraph, arguing that none of the Officers mentioned May's step in their Incident Reports. (*Id.* ¶ 28.) However, the Officers' failure to report May's step towards Officer Cook does not create a genuine issue of material fact. These Reports, made in the early morning hours of September 12, are not on par with sworn statements made in a deposition. Failure to mention specific events in the former does not cast doubt on testimony made during the latter. As a result, impeachment by omission here would be inappropriate. *Cf. Watkins v. Pinnock*, 802 F. App'x

17

450, 459 (11th Cir. 2020) (affirming a lower court's ruling that omissions of information from prior reports or statements is not cause for impeachment by omission). Thus, the Court deems the fact that May stepped towards Officer Cook as he entered his cell admitted, which renders the Officer's decision to deploy his taser reasonable under the circumstances.

All other uses of force—the subsequent taser deployments, the pepper spray, closed fist strikes, the spit mask, and the numerous restraints—resulted directly from May's resistance to and noncompliance with the Officers' commands. None of these uses of force are categorically unconstitutional, and the undisputed facts indicate that all of these actions were taken in response to May's active resistance to the Officers' directives. In terms of taser deployments, several Officers used their tasers in different ways: Officer Cook deployed his taser and subsequently pressed the ARC button twice; Officer Jackson used the drive stun feature of his taser twice; and Officer Whitaker deployed his taser and subsequently executed two drive stuns. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 36–40, 46, 54–55, 57.) All of these utilizations of the tasers were rendered as May continued to resist the Officers, presenting a safety and flight risk. (*Id.* ¶¶ 39, 47, 49–53.) Thus, under the circumstances, the Officers' taser deployments appear reasonable.

The same is true for Officer Whitaker's use of pepper spray. After Officer Whitaker's taser deployments failed to limit May's movements, Officer

18

Whitaker sprayed May's face with pepper spray. (*Id.* ¶¶ 55, 60, 63, 66.) Use of pepper spray is not categorically unconstitutional. *See McCormick v. City of Ft. Lauderdale*, 333 F.3d 1234, 1245 (11th Cir. 2003) ("Pepper spray is an especially noninvasive weapon and may be one very safe and effective method of handling a violent suspect who may cause further harm to himself or others.") Its use is reasonable where an arrestee or detainee is not restrained and poses risks to himself and others. *See Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.") Here, because Officer Whitaker deployed the pepper spray as May was physically resisting the Officers, his actions were not objectively unreasonable under the circumstances, and the Plaintiffs cannot show that these actions violated May's clearly established constitutional rights.

Officer Roache's takedown was similarly reasonable under the circumstances. Officer Roache witnessed May struggling with and fighting the other Officers in the cell, and after Officer Whitaker deployed his pepper spray, May ran towards Officer Roache at the entrance of the cell. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 69–70.) Given these facts, a reasonable officer could determine that May represented a safety and flight risk, and Officer Roache's decision to

perform a takedown maneuver was therefore reasonable.[6]

Officer Strowder punched May four times while attempting to place handcuffs on him. (*Id.* ¶ 80.) There is some dispute as to the events leading up to these punches. Officer Strowder testified that May grabbed the handcuffs and she feared that he would use them as a weapon. (*Id.* ¶¶ 79–80.) However, the Plaintiffs respond by pointing to Officer Copeland's deposition testimony, in which he testified that he assisted with handcuffing May but did not see May grab the handcuffs or Officer Strowder strike May. (Copeland Dep. 38:23–39:17.) The Plaintiffs argue that this directly refutes Officer Strowder's version of events and indicates there were no issues in getting the handcuffs on May. Even drawing all inferences in favor of the Plaintiffs and finding that May never grabbed the handcuffs, the Plaintiffs overstate the case that there were no issues in handcuffing May. Officer Copeland's deposition testimony clarifies the matter:

> Q: [I]t sounds like your recollection then is that there was a struggle going on and you were able to put the handcuffs on Mr. May; correct?
> A: Correct.
> Q: Do you recall seeing any officers use a closed-hand fist and strike Mr. May during that confrontation?

---

[6] Officer Roache also applied leg irons to May with the assistance of Officers Cook, Jackson, and Goodwine. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 72–73.) Despite some arguments in the brief regarding their application, the Plaintiffs' Second Amended Complaint does not discuss leg irons independently as part of their excessive force claim, and their briefing does not address them independently. Thus, the Court will only discuss leg irons in the context of the Plaintiffs' claims regarding the transport chair.

> A: No.
> Q: Right. But you don't recall any issue, uh, you were able to put the handcuffs on Mr. May; correct?
> A: Correct. I mean, yes, assisted with putting the handcuffs on, yes.

(*Id.* at 39:4–39:17.) This testimony does not indicate that there were no issues in handcuffing May. In fact, Officer Copeland's testimony confirms an active struggle between May and the Officers. Further, though a question begins to ask whether there were issues in handcuffing May, the question changes course, and Copeland clearly answers the second half of the question. Thus, the Court deems Officer Strowder's claim that May grabbed the handcuffs as disputed but finds that the Plaintiffs have not provided evidence that would indicate that May "permitted the [O]fficers to handcuff him without any issues." (Pls.' Response to Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 80.)

Thus, the question becomes whether Officer Strowder's closed fist strikes were reasonable in light of May's struggle with the Officers. Under the *Kingsley* factors, her actions were not clearly unreasonable. Officer Strowder saw May actively resisting the Officers and stepped in to assist. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 77–78.) The *Kinglsey* factors indicate that four closed-fist strikes represented a proportional use of force given the security and safety risks associated with May's active resistance. *See Kinglsey*, 576 U.S. at 397. As such, Officer Strowder's punches in the cell were not objectively unreasonable. The

21

same analysis applies for Officer Whitaker and Officer Roache's closed-fist strikes to May's legs after his decontamination, as May was actively resisting the Officers and kicking his legs near the Officers who were attempting to dress him. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶¶ 118–19.)

Finally, the Plaintiffs claim that the Officer Defendants' use of restraints constituted excessive force. The Plaintiffs claim that the spit mask and the restraints used on May were excessive. (Pls.' Br. in Opp'n to Officer Defs.' Mot. for Summ. J., at 21–23, 30.) First, the use of a spit mask by Officer Delacruz does not represent excessive force. The Plaintiffs fail to describe how a spit mask could represent excessive force in their Second Amended Complaint or Opposition Brief. Indeed, even if its placement did violate his constitutional rights, the Plaintiffs fail to point to case law that would put Officer Delacruz on notice that such conduct was clearly unconstitutional. Second, the Plaintiffs argue that the transport chair and additional restraints also constituted excessive force because Officers Paige, Delacruz, Whitaker, Roache, and Jackson were ultimately disciplined for their uses of these restraints on May. (*Id.* at 20, 22–23.) However, the undisputed facts indicate that May continued to resist the Officers while in the restraint chair. (Officer Defs.' Statement of Undisputed Material Facts in Supp. of Officer Defs.' Mot. for Summ. J. ¶ 101.) As with all of the actions discussed above, May's continued resistance indicates that the Officers' use of this chair was not objectively

unreasonable under the circumstances.

The Plaintiffs generally do not specifically detail how the Officer Defendants violated May's constitutional rights or provide specific case law that would indicate such unconstitutionality was clearly established. Instead, the Plaintiffs paint with broad brushstrokes. First, the Plaintiffs frame the actions of the Officer Defendants as collectively unreasonable; the use of tasers, pepper spray, punches, spit mask, and restraint chair all together represented an objectively unreasonable display of force against May. (Pls.' Br. in Opp'n to Officer Defs.' Mot. for Summ. J., at 29.) But as noted above, qualified immunity analyses must be specific to each Officer, and the Plaintiffs' claim that all of the Officer's actions taken together represent excessive force does not fit within this framework. Second, the Plaintiffs do not identify sufficient precedents within the Eleventh Circuit that clearly establish the claimed rights.[7] These precedents may not exist: While the Eleventh Circuit has long "embraced and reiterated the principle that an officer may not continue to use force after a detainee has clearly stopped resisting[,]" the undisputed facts show that force

---

[7] The Plaintiffs do cite a small number of cases, but none are persuasive. For example, the Plaintiffs cite *Shuford v. Dekalb Cty., Ga.*, 749 F.3d 1049 (11th Cir. 2014), as putting the Officer Defendants on notice as to the reasonableness of their restraint chair use. However, despite the Plaintiffs' arguments to the contrary, *Shuford* is clearly distinguishable. In that case, the plaintiffs alleged they had been restrained in the chairs for several hours and were restrained by officers who entered their isolation cells without warning. *Id.* at 816. Two of the plaintiffs were actively complying with the officers' orders when they were restrained. *Id.* These facts render *Shuford* sufficiently distinguishable here.

was only used against May when he was resisting the Officers' instructions. *See Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019). Instead of case law, the Plaintiff relies heavily on a "broad statement of principle within the Constitution" and the alleged objective egregiousness of the Officers' conduct to find that they had sufficient notice of their unconstitutional actions. (*Id.* at 28–29.) However, as detailed above, these actions do not represent such shocking conduct that their unconstitutionality can be inferred by anything less than clear precedent. *See Hoyt v. Cooks*, 672 F.3d 972, 978 (11th Cir. 2012) ("For there to be such obvious clarity that an officer's conduct would violate a clearly established right even in the absence of caselaw, the conduct must have been so far beyond the hazy border between excessive and acceptable force that the officer had to know he was violating the Constitution." (internal quotation marks and punctuation omitted)). As a result, the Plaintiffs arguments fail to demonstrate a genuine issue of material facts as to whether the Officer Defendants violated May's constitutional rights through objectively unreasonable actions and failed to show that these rights, if violated, were clearly established as of September 11, 2018. As a result, the Officer Defendants are entitled to qualified immunity as to the Plaintiffs' excessive force claim.

### ii. Deliberate Indifference

Deliberate indifference claims made under the Fourteenth Amendment are held to the same standard as those made under the Eighth Amendment.

24

*See Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). "To survive summary judgment in a case alleging deliberate indifference, a plaintiff must produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Goodman v. Kimbrough*, 718 F.3d 1325, 1331 (11th Cir. 2013) (internal quotation marks omitted). The Plaintiffs claim that the Officers were aware of May's serious medical need after his altercation with them and that the Officers "stood by and watched Mr. May struggle and go unconscious without offering assistance." (Pls.' Br. in Opp'n to Officer Defs.' Mot. for Summ. J., at 32.) They argue that the Officer Defendants failed to take May to the infirmary immediately after decontamination, instead taking him within view of the security cameras in the property room. (*Id.* at 23–24.) In response, the Defendants note that even if there was a serious medical need shown, the Officers called for Didier to examine May, and he did so before May lost unconsciousness. (Officer Defs.' Reply Br. in Supp. of Officer Defs.' Mot. for Summ. J., at 12.)

Even assuming the Plaintiffs have established the first element of a deliberate indifference claim—an objectively substantial risk of harm—they fail to generate a genuine issue of material fact as to the second element. This element—the Defendants' deliberate indifference towards the risk of harm— "has both a subjective and an objective component." *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019).

> Subjectively, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and also draw the inference. Objectively, the official must have responded to the known risk in an unreasonable manner, in that he or she knew of ways to reduce the harm but knowingly or recklessly declined to act.

*Id.* (internal quotation marks, punctuation, and footnotes omitted). The video footage dispels any notion that the Officer Defendants responded unreasonably to May's conditions. Within 90 seconds of entering the property room, May was being examined by Didier. After Didier left, Officer Whitaker could be seen moving May's chair, and once May's movement stopped, he began to jostle him and touch his face. When Officer Whitaker's efforts did not generate a response in May, another Officer begins to touch May. Thus, the Officers alerted medical staff to his presence, secured a quick evaluation for May, and reacted when his condition deteriorated. Even if these actions should have been taken in the infirmary, the Officer Defendants' actions did not rise beyond negligence as required by deliberate indifference claims. *Goodman*, 718 F.3d at 1332–33 (finding the defendants' grossly negligent conduct insufficient to support a deliberate indifference claim). Because the Officer Defendants secured medical assistance and reacted to May's unconsciousness, the Plaintiffs have failed to present sufficient evidence regarding the Defendants' deliberate indifference towards the risk of harm, and their claim fails. Given the analysis above, the Officer Defendants are entitled to summary judgment on the claims against them, and their Motion for Summary Judgment is granted.

26

### C. The Naphcare Defendants' Motion for Summary Judgment

In their Second Amended Complaint, the Plaintiffs bring a claim of medical negligence against the Defendant Travis Williams and his employer, Naphcare. (Second Am. Compl., Count V.) They allege that Williams and other Naphcare medical professionals committed three deviations from the standard of care required under the circumstances, and that these deviations caused May's death. (*Id.* ¶¶ 111–12.) The Plaintiffs seek to hold Naphcare liable under a theory of *respondeat superior*. (*Id.* ¶ 115.) In their Motion for Summary Judgment, the Naphcare Defendants make two broad arguments. First, they argue that the Plaintiffs experts testifying with regards to the proper standards of care and May's cause of death are unreliable and cannot support the Plaintiffs' arguments. (Naphcare Defs.' Br. in Supp. of Naphcare Defs.' Mot. for Summ. J., at 19–21.) Second, they claim that even if this Court admits the testimony of the Plaintiffs' experts, this testimony does not suggest that any deviation from the standard of care caused May's death. (*Id.* at 22–23.) In response, the Plaintiffs argue that the experts should be permitted to testify that "earlier medical intervention by Naphcare, Inc. should have occurred to prevent the fatal confrontation between Antonio May and the officers." (Pls.' Br. in Opp'n to Naphcare Defs. Mot. for Summ. J., at 21.) The Plaintiffs repeatedly emphasize that decisions regarding proximate cause are best left to the jury. (*Id.* at 16, 25.)

"In order to prove medical malpractice in Georgia, a plaintiff must prove:

(1) the duty inherent in the health care provider-patient relationship; (2) breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure is the proximate cause of the injury sustained." *McDowell v. Brown*, 392 F.3d 1283, 1295 (11th Cir. 2004). "Proximate cause means 'that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred.'" *Arnold v. Turbow*, 357 Ga. App. 533, 537 (2020) (quoting *Guida v. Lesser*, 264 Ga. App. 293, 297 (2003)). "In order to establish proximate cause by a preponderance of the evidence in a medical malpractice action, the plaintiff must use expert testimony because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." *Zwiren v. Thompson*, 276 Ga. 498, 500 (2003). The expert's testimony "must be based on reasonable medical probability or reasonable medical certainty." *Georgia Clinic, P.C., v. Stout*, 323 Ga. App. 487, 495 (2013). While proximate causation is typically an issue reserved for a jury, a court can make a determination as a matter of law in "plain and undisputed cases." *Arnold*, 357 Ga. App. at 537 (internal quotation marks omitted).

Dr. Timothy Hughes, an expert witness for the Plaintiffs, has at least six years of experience in correctional medicine, both as a physician and as the Chief Medical Officer of a large correctional medicine corporation. (Dr. Hughes Report, at 1.) After reviewing the information of this case, Dr. Hughes found

28

five violations of the proper standard of care. (*Id.* at 4–5.) He concluded that:

> [H]ad Mr. May been appropriately screened and examined with the correct and prompt follow through by NaphCare medical staff, to include immediate classification to suicide watch and to have appropriate sedation ordered for his methamphetamine-induced psychotic behavior, the events that transpired and culminated in an episode of excited delirium and subsequent sudden cardiac death—further exacerbated by use of force secondary to his untreated psychotic behaviors—would in all medical probability not occurred. Clinicians in this setting should be anticipatory of the possibility of deterioration in agitated and/or violent detainees that are intoxicated with drugs of this class. . . . [T]he failure to act on the totality of the five [breaches of the standard of care] is egregious and . . . thus directly attributable to the escalation of force used and ultimately his death.

(*Id.* at 5.) Thus, Dr. Hughes faults the Naphcare defendants for failing to properly screen, classify, and sedate May upon arrival at the Jail. Dr. William Anderson, the Plaintiffs' other expert, a forensic pathologist offering testimony regarding the cause of May's death, concluded that:

> The physical restraints and other measures utilized by the officers[] were to a reasonable degree of medical certainty the cause of his death, measures which were precipitated by the confrontation initiated by the personnel of the Fulton County Jail.
>
> Utilization of these measures by jail personnel clearly exacerbated an already existing medical condition, characterized by mental illness and drug use, that was unaddressed during this period of incarceration.

(Dr. Anderson Report, at 3.) The only actions attributable to the Naphcare Defendants described here is the fact that May's "mental illness and drug use" allegedly went unaddressed.

Assuming, *arguendo*, that the testimony of the Plaintiffs' expert were

admitted, this testimony would not provide sufficient support for a medical malpractice claim under Georgia law. Both of the experts concede in their conclusions that an intervening event—May's altercation with the Officer Defendants—occurred between the actions of the Naphcare Defendants and May's death. In his report, Dr. Hughes claims that the failure to sedate May led to "the events that transpired and culminated in an episode of excited delirium and subsequent sudden cardiac death[.]" (Dr. Hughes Report, at 5.) While sedation might have prevented the encounter between May and the Defendant Officers, the failure to sedate May did not render this chain of events medically probable; too many actions and choices made by May and the Officers stand in between the decisions of the Naphcare Defendants and May's death to deem their failure to sedate May the proximate cause of the events. Dr. Anderson's report similarly notes the intervening events, going as far as to claim that the "physical restraints and other measures utilized by the officers[] were to a reasonable degree of medical certainty the cause of [May's] death[.]" (Dr. Anderson Report, at 3.) These decisions and actions of the Officer Defendants "exacerbated an already existing medical condition . . . that was unaddressed during this period of incarceration." (*Id.*) But again, the failure to address these underlying medical conditions did not render May's disruptive behavior and the Defendant Officers' specific responses to that behavior medically probable. As such, the encounter between May and the Defendant Officers represents a break "in the natural and continuous sequence" of events

30

required for proximate cause. *Arnold*, 357 Ga. App. at 537. The Plaintiffs' experts' testimony, even if admitted by this Court, does not sufficiently indicate that the Naphcare Defendants' actions proximately caused May's death. As a result, the Plaintiffs have failed to show a genuine issue of material fact as to proximate cause, and their medical malpractice claim against the Naphcare Defendants fails.

## IV.   Conclusion

As the Court noted at the outset, Antonio May's death was a tragedy. This Court's Order does not mean that his death was in any way acceptable or tolerable, nor that criticism of those involved is inappropriate. Instead, this Order merely reflects the result required by the operative law. For the reasons set forth above, the Officer Defendants' Motion for Summary Judgment [Doc. 209] is GRANTED, the Naphcare Defendants' Motion for Summary Judgement [Doc. 213] is GRANTED, and the Plaintiff's Motion for the Court to Take Judicial Notice of Adjudicative Facts [Doc. 235] is GRANTED. These rulings dispose of the Plaintiffs' remaining claims. Accordingly, the other Motions pending before this Court [Docs. 207, 214] are DENIED as moot, and the Clerk is DIRECTED to close the case.

SO ORDERED, this ____3rd____ day of February, 2022.

THOMAS W. THRASH, JR.
United States District Judge

31